### INTERNATIONAL CABLETEL INCORPORATED, Plaintiff,

v.

### LE GROUPE VIDEOTRON LTEE, Cable Road Investments Limited, Defendants.

#### No. 96 Civ.9558 (SS).

United States District Court, S.D. New York.

Sept. 19, 1997.

---

Philip R. Forlenza, Joel A. Kirsch, Patterson, Belknap, Webb & Tyler, New York, NY, for plaintiff.

Celia Goldwag Barenholtz, Elizabeth B. Daniel, Hang C. Lee, Kronish, Lieb, Weiner & Hellman, New York, NY, for defendants.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff International CableTel Inc. ("CableTel") brings this action complaining that defendant Cable Road investments Limited ("CRIL") entered into a fraudulent scheme in an effort to sell its majority interest in Videotron Holdings Plc ("Videotron"). According to the Complaint, CRIL lured CableTel into negotiating for the purchase of its interest in Videotron by falsely assuring CableTel—both orally and in a written agree-

ment—that CRIL would not enter into discussions with any other prospective buyers. In fact, CRIL never intended to negotiate exclusively with CableTel, but merely used CableTel in order to achieve leverage in its anticipated discussions with Bell Cablemedia Plc ("BCM"), already a minority owner of Videotron. After this scheme succeeded, with CRIL selling its majority interest in Videotron to BCM, CableTel commenced this action asserting claims of fraudulent inducement and unjust enrichment. Defendants now move for the dismissal of these claims, arguing that CableTel is limited to those remedies specified in the liquidated damages provision of its contract with CRIL. For the reasons to follow, the Court agrees with defendants.

## BACKGROUND

In early 1996, CRIL, a wholly owned subsidiary of Le Groupe Videotron Ltee ("GVL"), undertook to sell its majority interest in Videotron, a British cable and telecommunications services provider. CRIL hoped that it could secure a deal with BCM, already the owner of a substantial minority interest in Videotron. BCM was interested in purchasing Videotron, but because it viewed itself as the only viable purchaser, BCM was unwilling to meet CRIL's initial demands. BCM therefore declined to negotiate with CRIL, expecting that the asking price for Videotron would drop when no other prospective purchasers emerged. Unable to reach a satisfactory agreement with BCM, CRIL placed Videotron on the open market.

Encouraged by reports indicating that negotiations had broken down between CRIL and BCM, CableTel's managing director, in March 1996, contacted representatives of CRIL and expressed an interest in purchasing Videotron. Wary of being used as a "stalking horse" to lure BCM back into negotiations, however, CableTel sought assurances from CRIL that it would negotiate exclusively with CableTel for the purchase of Videotron. CRIL provided these assurances, repeatedly, and CableTel therefore entered into initial discussions with CRIL for the purchase of Videotron.

In August 1996, CableTel and CRIL representatives met in London to discuss the terms of a preliminary purchase agreement. CableTel, however, was unwilling to negotiate in earnest without first securing a letter of intent with a binding exclusivity provision. CRIL expressed its willingness to enter into such an agreement, and—during the days that the agreement was being finalized—CRIL reiterated to CableTel that it had no intentions of negotiating with any other parties, BCM in particular. (Complaint ¶ 21.) CRIL representatives explained that they had been "unhappy" with BCM's tactics, and that they were "tired of dealing with them." (Comp.¶ 22.)

On August 9, 1996, the parties executed the "Heads of Agreement" (the "Heads"), which outlined the nonbinding provisions of a proposed deal, and which included the following provision pursuant to which CRIL agreed to negotiate exclusively with CableTel for a specified time:

> CRIL acknowledges that [CableTel] will devote substantial time and incur substantial out-of-pocket expenses in connection with completing its business, financial and legal due diligence investigation, drafting and negotiating definitive documentation and financing necessary to complete the transactions described above ("the Transaction").... As an inducement for [CableTel] to proceed ... CRIL agrees that for ... the "Exclusive Period", ... CRIL, its affiliates and their respective officers, directors and representatives ... will not ... initiate, negotiate or hold any understanding or agreement with, any party other than [CableTel]....

(Renault Aff.Ex. B.) This exclusivity provision, initially binding through September 12, 1996, was ultimately extended to October 16, 1996.

To ensure CRIL's compliance with the exclusivity provision, the Heads included a liquidated damages provision pursuant to which CRIL would be liable to CableTel in the amount of $ 10,000,000 in the event that CRIL were to sell its majority interest in Videotron at any time during or within ninety days after the conclusion of the exclusivity

period. This provision was included at Paragraph 9 of the Heads:

> If a Third Party Acquisition ... shall occur either during the Exclusive Period (or any extension thereof) or ... before the expiry of 90 days from the later of termination of negotiations and the expiry of the Exclusive Period (as so extended), CRIL shall pay to [CableTel] within five working days of completion of the Third Party Acquisition ... a fee of US$10,000,000. *The receipt of such fee shall remove any entitlement to and satisfy any claims [CableTel] may have (known and unknown) arising out of the subject matter of these Heads arising at or prior to the time of such payment; accordingly [CableTel] shall have no further remedy for breach of Paragraph 7.*

(Renault Aff.Ex. B (emphasis added).)

According to the Complaint, CRIL never had any intention of honoring the Heads, but—exactly as CableTel had feared—CRIL was merely using CableTel as a "stalking horse." That is, CRIL never planned or even hoped to sell Videotron to CableTel, but negotiated with CableTel merely in the hopes of "eventually" luring BCM back into negotiations and on more favorable terms than before. (Comp.¶ 25.) The scheme succeeded.

Despite their assurances, and despite the exclusivity provision of the Heads, CRIL negotiated with BCM throughout much of the time that CableTel was working to achieve its own deal with CRIL. Indeed, in order to maintain its leverage over BCM, CRIL negotiated with CableTel virtually up until the moment that it announced that a deal had been reached with BCM. The purchase agreement between CRIL and BCM was executed on October 16, 1996, only days after CableTel officials had arrived in London for a final round of negotiations. CableTel realized that BCM had breached the exclusivity provision of the Heads only when, shortly before CableTel expected to announce its own purchase of Videotron, CRIL informed

CableTel that a deal with BCM was imminent.

CableTel commenced this action in December 1996, claiming fraud in the inducement, seeking to pierce the corporate veil between CRIL and GVL, and alleging that defendants were unjustly enriched in the amount of $ 84 million by their misconduct.[1] CRIL responds that plaintiff's only recourse rests in the liquidated damages provision of the Heads, and that plaintiff cannot avoid the binding effect of this contract provision merely by fashioning its claims in tort rather than in contract. For the reasons explained, the Court agrees with defendants.

### DISCUSSION

In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of the party making them. *See Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1412, 122 L.Ed.2d 784 (1993). The Court may properly dismiss a claim only if, after viewing all allegations in the light most favorable to the plaintiff, it determines "beyond doubt that the plaintiff can prove no set of facts in support of its claims which would entitle him to relief." *Id.* (quoting *Ricciuti v. New York City Transit Authority*, 941 F.2d 119 (2d Cir.1991)).

I. Fraud In The Inducement

A. False Statements Of Future Intent

It is well settled under New York law that "a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations ." *Rocanova v. Equitable Life Assurance Society Of The United States*, 83 N.Y.2d 603, 614, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940 (1994); *see also New York University v. Continental Insurance Co. (N.Y.U.)*, 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 288, 662 N.E.2d 763, 768 (1995) ("where a party is merely seeking to enforce

---

**1.** Because the Court finds that the Complaint fails to state any cause of action against CRIL in connection with the Videotron negotiations, the Court finds it unnecessary to consider whether there exists a basis to pierce the corporate veil between CRIL and GVL.

its bargain, a tort claim will not lie."); *Brief-stein v. P.J. Rotondo Construction Co.,* 8 A.D.2d 349, 187 N.Y.S.2d 866, 868 (1st Dep't 1959) ("To say that a contracting party intends when he enters into an agreement not to be bound by it is not to state 'fraud' in an actionable area, but to state a willingness to risk paying damages for breach of contract."); *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 19 (2d Cir.1996) ("these facts amount to little more than intentionally-false statements by Beladino indicating his intent to perform under the contract. That is not sufficient to support a claim of fraud under New York law."); *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.,* 56 F.3d 427, 434 (2d Cir.1995) ("A cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing it."); *Sudul v. Computer Outsourcing Services,* 868 F.Supp. 59, 62 (S.D.N.Y.1994) ("where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract."); *Kulas v. Adachi, KK,* 1997 WL 256957, * 9 (S.D.N.Y. May 16, 1997) ("plaintiff's allegation that KK Adachi did not intend to honor the contract at its formation cannot transform a breach of contract claim into a fraud claim.").

■ It is equally well settled under state law that "if a promise was made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a 'material existing fact.' " *Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957); *see also Channel Master Corp. v. Aluminium Ltd. Sales, Inc.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958) ("a statement of present intention is deemed a statement of a material existing fact, sufficient to support a fraud action."). And it is precisely such a misrepresentation which can serve as the basis for a claim of fraud. *See Sudul,* 868 F.Supp. at 62 ("a contracting party can be held liable for fraud when, at the time he made a promise, he did not intend to keep it.").

Any apparent tension between the two aforementioned principles of New York law has been reconciled through a rule, widely adopted by the state and federal courts, pursuant to which a false promise can support a claim of fraud only where that promise was "collateral or extraneous" to the terms an enforceable agreement in place between the parties. *Graal Enterprises Ltd. v. Desourdy International 1949 Inc.,* 1996 WL 353003, * 4 (S.D.N.Y. June 26, 1996); *see also Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986) (holding that a representation of present fact which was "the inducement for the contract" and which was "collateral to" that contract, could support a claim of fraud); *Sudul,* 868 F.Supp. at 62 ("A long line of New York courts have carved out an exception to the rule laid out in *Sabo* and *Channel Master.");* *PI, Inc. v. Quality Products, Inc.,* 907 F.Supp. 752, 761 (S.D.N.Y.1995) ("A cause of action for fraud can be maintained on the basis of allegations that a party made a collateral or extraneous misrepresentation that served as an inducement to the contract."); *OHM Remediation Services Corp. v. Hughes Environmental Systems, Inc.,* 952 F.Supp. 120, 123 (N.D.N.Y.1997) ("if the fraud claim is based on an agreement not integrated into the contract at issue, such as a collateral oral agreement, the plaintiff may maintain a claim for fraud simultaneously with the breach of contract claim."); *D.S. America (East), Inc. v. Chromagrafx Imaging Systems, Inc.,* 873 F.Supp. 786, 796 (E.D.N.Y.1995) ("a misrepresentation of present fact, not of future intent, collateral or extraneous to the contract, but which is an inducement to the contract, can give rise to a separate claim of fraudulent inducement."). Thus, plaintiff can proceed with its claim of fraud only to the extent that the misrepresentations upon which that claim is based are "collateral or extraneous" to the Heads.

■ In the words of Richard Lubasch, CableTel's General Counsel and Senior Vice President, "[t]he complaint stems from the

defendants' deliberate misrepresentations regarding their intention to fulfill contractual obligations. . . . Specifically, the complaint alleges that defendants entered into a binding agreement to negotiate exclusively with CableTel for the sale of their interest in Videotron . . . with the preconceived and undisclosed intent not to honor the obligation thereby assumed." (Lubasch Aff. 2.) Rephrased only slightly, the gravamen of the complaint is that defendant misrepresented that it would negotiate exclusively with plaintiff in order to induce plaintiff into entering an agreement whereby defendant was required to negotiate exclusively with plaintiff. To describe plaintiff's claim is to expose its fundamental flaw. Defendant's promise to negotiate exclusively with plaintiff plainly was not collateral to the Heads, it was memorialized in that agreement as defendant's principle obligation.[2] Thus, defendants' allegedly false statements of future intent cannot support the present cause of action.

■ Perhaps recognizing the futility of arguing that CRIL's promise to negotiate exclusively with CableTel was somehow extraneous to the Heads, plaintiff focuses its efforts on distinguishing and discrediting those cases applying the collateral promise rule. First, plaintiff argues that for purposes of that rule, any promise made prior to the time that a contract is executed is properly deemed collateral to that contract. (Opp. at 8.) This approach, which defies any common understanding of the term "collateral," is simply not a fair synthesis of the pertinent case law. While defendant identifies no instances in which an allegedly false promise was deemed "collateral" merely on the basis of timing, there are numerous decisions in which courts have dismissed fraud actions premised upon false promises made in advance of binding agreements. *See, e.g.,* *PI, Inc.,* 907 F.Supp. at 756 ("Relying on the representations of Ogle and Renaldo, the plaintiff allegedly agreed to sell PICPC to Quality. The parties *eventually executed* a

plan of merger . . .") (emphasis added); *OHM,* 952 F.Supp. at 122 ("*Prior to signing* the contract, OHM relied" upon defendant's alleged misrepresentations) (emphasis added); *Sudul,* 868 F.Supp. at 61 ("plaintiff claims that [defendants] induced him to enter into the employment agreement by promising that COSI would honor its obligations under that agreement, even though the defendants did not actually intend that COSI would do so.").

To the extent that unfavorable precedent cannot be distinguished, plaintiff adopts a more blunt approach. Specifically, plaintiff argues that the numerous decisions applying the collateral promise rule to dismiss claims of fraudulent inducement are simply wrong. (Opp. at 8.) In support of this characterization, plaintiff relies upon a recent decision in which the New York Court of Appeals permitted a plaintiff law firm to proceed with a claim of fraud against a former partner who allegedly solicited firm clients despite earlier assurances that he would encourage those clients to remain with the firm. *Graubard, Mollen, Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995). The *Graubard* Court also permitted plaintiff to proceed with a breach of contract claim based upon a retirement agreement pursuant to which firm partners agreed that they would use their "best efforts" to expose clients to other firm attorneys in the hope that those clients would stay with the firm following their retirement. In support of its decision to permit plaintiff to proceed simultaneously with both fraud and contract claims, the Court reasoned that "[a] false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *Graubard,* 86 N.Y.2d at 122, 629 N.Y.S.2d 1009, 653 N.E.2d 1179.

There are a number of problems with plaintiff's position that, after *Graubard,* a litigant can proceed with a claim of fraud even where that claim is premised upon a

---

2. In its complaint, plaintiff implicitly recognizes that defendant's alleged misrepresentation did not concern a matter collateral to the Heads. The third cause of action set forth in the complaint—a claim which plaintiff has since withdrawn—sought rescission of the Heads, under principles of English law, on the basis of a breach by defendant going to the "root of the contract." (Comp. ¶'s 61–65.) A false statement which goes to the "root" of an agreement is of course not a false statement which can be deemed "collateral" to that agreement.

false promise directly incorporated into a written agreement. First, *Graubard* is not the most recent New York Court of Appeals decision addressing the possibility of redundant fraud and contract claims. *See NYU,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763. In *NYU,* the Court considered whether plaintiff could sue a defendant insurance company on the basis of allegations that defendant fraudulently induced plaintiff to maintain an insurance policy by falsely representing that it would evaluate plaintiff's claims in good faith. Reasoning that a covenant of good faith and fair dealing is "implicit in every contract," the Court dismissed plaintiff's fraud claim as "nothing more than a breach of contract." *Id.* at 318, 639 N.Y.S.2d 283, 662 N.E.2d 763. In another post-*Graubard* decision, the Second Circuit, also adhering to the collateral promise rule, rejected a claim of fraud premised upon a defendant's alleged misrepresentations that it intended to honor its payment obligations under a collection agreement in force between the parties. *Bridgestone,* 98 F.3d at 19. Decisions such as *NYU* and *Bridgestone* demonstrate that neither the New York Court of Appeals nor the Second Circuit understands *Graubard* to have supplanted the collateral promise rule.

In other recent decisions, courts have evaluated the *Graubard* decision, and have demonstrated that it is consistent—on its facts—with the collateral promise rule. *See, e.g., Papa's–June,* 921 F.Supp. at 1161–62 ("The recent decision [in *Graubard*] does not change the law in this area .... apart from the contract, the former partner owed his firm a fiduciary duty not to solicit clients.... Moreover, the oral representations that were the basis of the fraud claim were collateral to the provisions of the retirement agreement."); *Big Apple Car, Inc. v. City of New York,* 650 N.Y.S.2d 730, 732 (1st Dep't 1996) ("*Graubard* is not to the contrary. In that case, there were allegations of misrepresentation and fraud extraneous to the resignation agreement sued on by plaintiff.").[3] For

assorted reasons, then, any confusion amongst the New York courts concerning the scope and applicability of the collateral promise rule must give way to the majority view—an overwhelming majority view—that a false promise, whenever made, cannot give rise to a fraud claim where that promise is directly incorporated into a written contract between the parties. *See PI, Inc.,* 907 F.Supp. at 761 ("the numerous decisions of Appellate Division are persuasive authority of the law in New York which this Court must follow.") (collecting cases); *Best Western International, Inc. v. CSI International Corp.,* 1994 WL 465905, * 4–5 (S.D.N.Y. Aug.23, 1994) ("The majority of courts, including the Appellate Division, have held that simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim .... this Court adopts the reasoning employed by the Appellate Division ... since that is presumably the reasoning which would be applied to Plaintiffs claim if it were brought in New York State Supreme Court.").

Finally, the "collateral promise" rule, as it has been understood and applied by the vast majority of courts, reflects sound policy. Indeed, to rule in plaintiffs favor in this action would be to undermine the predictability that is essential to contracting, the predictability which permits sophisticated entities to enter into transactions understanding both their responsibilities and the potential scope of their liabilities. In this case, plaintiff plainly recognized the risks and benefits of dealing with CRIL, and it contracted accordingly. Skeptical of CRIL's representations of exclusivity, plaintiff secured an agreement pursuant to which CRIL bound itself to those representations and exposed itself to the potential for $ 10,000,000 in liquidated damages in the event of a breach. Now that a breach apparently has occurred, CableTel must make due with the terms of the agreement

---

**3.** In yet another post-*Graubard* decision, one in which it was unnecessary to apply *Graubard* directly, a district court expressed its skepticism that the Court of Appeals, with its "Delphic utterance" concerning the possibility of "related" fraud and contract claims, intended to do any-thing as substantial as rejecting the long standing collateral promise rule. *Champion Titanium Horseshoe, Inc. v. Wyman–Gordon Investment Castings, Inc.,* 925 F.Supp. 188, 190 (S.D.N.Y. 1996)

that it negotiated, and with the sizeable sum that it secured for itself in the event of precisely the sort of misconduct which lies at the heart of its complaint in this action.[4]

### B. Plaintiff Fails To Identify Any False Statements As To Collateral Matters

As explained, plaintiff cannot proceed with its claim that defendant committed fraud by falsely representing that it intended to negotiate exclusively with plaintiff. Although it is this claim that lies at the core of the complaint, plaintiff urges the Court that this action can proceed on the basis of "several representations that went beyond [defendant's] contractual promise." (Opp. at 10.) In particular, in advance of securing the Heads, defendant allegedly represented to CableTel that it was "tired of negotiating" with BCM, that it was "unhappy with BCM's negotiating tactics," and that it "had no intention of pursuing a deal" with BCM. (Opp. at 10–11.)

Plaintiff is correct that the first two representations which it identifies in its Opposition were not merely expressions by CRIL that it would honor its obligations under the Heads. Rather, those statements were representations by defendant concerning the status of its relationship with BCM up to the time that it entered into discussions with CableTel. Strictly speaking, then, these statements did not concern CRIL's obligations under the Heads and they were therefore collateral to that agreement. The problem for plaintiff, however, is that there is no suggestion in the Complaint that these statements by defendant were false. Quite the contrary; this action is premised upon the notion that defendant lured CableTel into negotiations precisely because defendant was unhappy with BCM's negotiating tactics.

According to the Complaint, negotiations had broken down between CRIL and BCM, and this break down occurred specifically because CRIL was frustrated that BCM would not make a reasonable offer to purchase Videotron in the absence of perceived competition from another interested party. Indeed, plaintiff alleges that CRIL entered into discussions with CableTel specifically in the hopes that it might "eventually" lure BCM back into negotiations that—in the absence of a competitor—had been disappointing and had concluded unsuccessfully. (Comp.¶ 25.) Thus, in whatever way plaintiff might try to dress up its allegations to avoid the ugly treatment of unfavorable case law, CableTel cannot avoid that the allegedly false statements lying at the heart of its complaint involved CRIL's promise to honor its obligations under the Heads.

As to the remaining statement identified in the Opposition—i.e., defendant's alleged misrepresentation concerning its "intent" not to negotiate with BCM—this merely restates, in the negative, those alleged misrepresentations which the Court has already dismissed as noncollateral statements of future intent. In other words, just as plaintiff cannot claim fraud based upon CRIL's alleged promise to negotiate only with plaintiff; plaintiff cannot claim fraud based upon CRIL's alleged promise not to negotiate with BCM. Indeed, given the circumstances which led to the Heads, it would be most disingenuous for plaintiff to argue that defendant's promise not to negotiate with BCM was somehow different from its promise to negotiate exclusively with CableTel. It was, after all, the specter of negotiations between CRIL and BCM that prompted CableTel to demand the exclusivity provision set forth in the Heads. In claiming that it would avoid negotiations with BCM, CRIL was—in so many words—

---

**4.** Although defendant does not raise any argument related specifically to the language of the liquidated damages provision, it is worth noting that the terms of that provision are extremely broad; plaintiff agreed that its receipt of the specified $ 10,000,000 payment would settle "any claims [CableTel] may have (known and unknown) arising out of the subject matter" of the Heads. (Renault Aff.Ex. B.) Although it is unclear from the record whether CRIL has ten-

dered the specified amount, it appears that—upon such payment—the liquidated damages provision of the Heads would operate as a release barring the present cause of action. *See Rocanova,* 83 N.Y.2d at 616, 612 N.Y.S.2d 339, 634 N.E.2d 940 ("Inasmuch as the 'language of the release is clear, effect must be given to the intent of the parties as indicated by the language employed.' ") (citations omitted).

simply expressing its intent to honor its contractual obligations.

■ In sum, fraud in the inducement can be supported by a false statement of present fact, or by a false statement of future intent which concerns a matter collateral to a contract between the parties. The crux of plaintiff's complaint is that defendant made false representations concerning its intention to negotiate exclusively with plaintiff. These statements, because they were the central concern of the Heads, cannot support a claim for fraudulent inducement. Moreover, plaintiff is unable to salvage its claims by identifying any alleged false statements apart from those concerning defendant's contractual obligations.

II. Unjust Enrichment

■ CableTel seeks to recover $ 84 million from CRIL arguing that CRIL was unjustly enriched in this amount on account of its "stalking horse" scheme. For similar reasons as those already discussed, this claim cannot survive. Specifically, a valid contract governing a particular matter precludes a recovery in quasi-contract for events arising out of the same subject matter. *See Standardbred Owners Association, Inc. v. Yonkers Racing Corp.*, 209 A.D.2d 507, 619 N.Y.S.2d 613 (2d Dep't 1994) (plaintiff "seeks recovery in quasi contract on the doctrine of unjust enrichment. However, the record indicates that the purported quasi contract arises 'out of the same subject matter' governed by an enforceable written contract between the same parties.... Under these circumstances, the ... cause of action ... was properly dismissed.") (citations omitted); *see also Pennsylvania Engineering Corp. v. Islip Resource Recovery Agency*, 710 F.Supp. 456, 465 (E.D.N.Y.1989) ("Where an express contract exists between the parties, there can be no recovery under a claim of quantum meruit.").

## CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is GRANTED. The Clerk of the Court is directed to enter judgment dismissing this action in its entirety.

**SO ORDERED.**