**BATES ADVERTISING USA, INC., Plaintiff,**

v.

**William J. MCGREGOR, Defendant.**

**No. 01 Civ. 7413 (LAP).**

United States District Court, S.D. New York.

Sept. 23, 2003.

John B. Grant, Jr., Melina Sfakianaki, Greenberg Traurig, LLP, New York City, for Plaintiff.

Sean–Francis Kane, Peter D. Raymond, Hall, Dickler, Kent, Driedman & Wood, LLP, New York City, for Defendant.

### MEMORANDUM AND ORDER

PRESKA, District Judge.

Defendant William J. McGregor agreed to sell his advertising business to Bates Advertising USA, Inc. ("Bates") pursuant to a Stock Purchase Agreement ("Purchase Agreement") entered into by the parties. Bates now contends that it overpaid McGregor for his business and that McGregor has refused to repay the excess over the minimum purchase price set forth in the Purchase Agreement, thereby necessitating this action. McGregor argues that he has no obligation of repayment under the Purchase Agreement because it does not contain what he refers to as a "clawback" provision. The parties have cross-moved for summary judgment on this issue and McGregor has also moved on Bates' claim for unjust enrichment. In addition, Bates has moved for summary judgment on McGregor's counterclaims, which allege breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and unjust enrichment.

## BACKGROUND

The following facts are taken from the parties' submissions pursuant to Local Rule 56.1 and are undisputed unless otherwise noted.

### I. The Purchase Agreement

Bates and McGregor entered into a Purchase Agreement, dated July 20, 1998, by which Bates purchased all the stock of The Criterion Group, Inc. ("Criterion") from McGregor, its sole stockholder. The closing date of the sale and purchase was July 31, 1998. Pursuant to the Purchase Agreement, the name of Criterion was changed to Bates Travel and Tourism, Inc. ("BTT, Inc.").

The Purchase Agreement contains several provisions which are relevant to the instant motions. Article I, Section 1.2 of the Purchase Agreement provides as follows:

> *Purchase Price.* (a) In full consideration for the purchase by the Purchaser of the Stock [Bates], Purchaser shall pay to the Stockholder [McGregor] the Purchase Price. The following formula expresses the Purchase Price to be paid to Stockholder:
>
> $$\frac{8 \times (ADJ.PAT\ 1998\ +\ ADJ.PAT\ 1999\ +\ ADJ.PAT\ 2000)}{3}$$

The Purchase Price shall be paid in four installments, which are referred to, respectively, as Tranche A, Tranche B, Tranche C, and Tranche D. Tranche A

shall be paid at Closing by wire transfer to an account designated in writing by the Stockholder or official bank check. After the Closing Date, Purchaser shall pay to the Stockholder Tranches B, C, and D (the "Post–Closing Consideration"), pursuant to Section 1.3 and subject to the other terms and conditions herein.

(Purchase Agreement § 1.2, Ex. A to the Declaration of Melina Sfakianaki in Support of Bates' Motion for Partial Summary Judgment ("Sfakianaki Decl.")). Bates maintains that this provision demonstrates that "[t]he 'Purchase Price' for McGregor's stock (the 'Stock') is that dollar amount that equals the average of the adjusted profit after tax for the future three year period times a multiple of eight," and that "[t]he dollar amount so calculated is the 'full consideration for the purchase by the Purchaser of the Stock.'" (Bates' Rule 56.1 Statement in Support of its Motion for Partial Summary Judgment ¶ 2). McGregor disputes that this provision reflects "a complete description of the payment provisions of the Agreement." (McGregor's Response to Bates' Rule 56.1 Statement ¶ 2).

Section 1.3 of the Purchase Agreement provides in relevant part:

> Section 1.3 *Post–Closing Consideration.* In the absence of a Dispute Notice . . ., Purchaser shall, subject to the terms of Section 4.1, pay each Tranche of Post–Closing Consideration to the Stockholder within fifteen (15) days after the final determination of the amount of such Tranche, by official bank check payable to the order of the Stockholder or by wire transfer to an account designated in writing by the Stockholder. The amount of each Tranche of Post–Closing Consideration shall be calculated as follows (as adjusted pursuant to Section 1.4):

> (a) Tranche B = (8 × ADJ.PAT 1998)—Tranche A

> (b) Tranche C = 8 × (ADJ.PAT 1998 + ADJ.PAT 1999)/2—(Tranche A + Tranche B)

> (c) Tranche D = 8 × (ADJ.PAT 1998 + AJD.PAT 1999 + ADJ.PAT 2000)/3—(Tranche A + Tranche B + Tranche C)

> (d) *Definitions.* For the purposes of this Agreement, the following words shall have the following meanings:

> (1) "Tranche A" shall mean $1,500,000;

> (2) "Tranche B" shall mean the amount determined after the close of the calendar year 1998 pursuant to Subsection (a) of this Section 1.3;

> (3) "Tranche C" shall mean the amount determined after the close of the calendar year 1999 pursuant to Subsection (b) of this Section 1.3;

> (4) "Tranche D" shall mean the amount determined after the close of the calendar year 2000 pursuant to Subsection (c) of this Section 1.3 . . . .

(Purchase Agreement § 1.3, Ex. A to Sfakianaki Decl.). McGregor argues that Section 1.2 together with Section 1.3 demonstrate "that the four [Tranche] payments together would constitute Bates' purchase price for [Criterion]." (Declaration of William J. McGregor in Support of his Motion for Summary Judgment ("McGregor Moving Decl.") ¶ 5).

Section 1.5 of the Purchase Agreement sets forth the "Purchase Price Maximum and Minimum," and provides: "All other provisions of this Agreement notwithstanding, the Purchase Price shall not exceed $15,000,000 and shall not be less than

$1,500,000 . . . ." (Purchase Agreement § 1.5, Ex. A to Sfakianaki Decl.). There is no dispute that the minimum purchase price of $1,500,00 was paid at the closing of the deal on July 31, 1998. This amount constituted Tranche A. Section 4.1 of the Purchase Agreement, titled "Computation of Purchase Price," sets out the process by which the amounts for Tranches B, C and D are to be computed. This process, in greatly simplified terms, includes a period of back-and-forth between Bates and McGregor during which each reviews the other's calculations and possibly has the same reviewed by an independent auditor. (*See* Purchase Agreement § 4.1, Ex. A to Sfakianaki Decl.).

When the time came for Bates to pay McGregor the Tranche B amount, the parties initially could not agree on what that amount should be, but eventually entered into a Letter Agreement dated October 29, 1999, which provides in relevant part as follows:

> Bates shall pay you [McGregor] the sum of $1,086,000 as the Tranche B payment, in full and complete settlement of said payment, including the manner in which it was calculated. However, although the methodology used to calculate the Company's PBT for 1998 and the Tranche B shall not be subject to further dispute, both you and Bates reserve their respective rights regarding the manner in which the Tranche C and D payments shall be calculated pursuant to the terms of the Stock Purchase Agreement and neither shall be estopped by the Tranche B payment to challenge the manner in which the Company's PBT is computed for the years 1999 and 2000, or the manner in which the RCI contract has been renegotiated.

(10/29/99 Letter Agreement at 2, Ex. B to McGregor Moving Decl.). With respect to Tranche C, the parties entered into a similar, although much more brief, Letter

Agreement dated May 30, 2000, which provides: "This confirms we have agreed that the amount of the Tranche C payment due to you in accordance with the terms of our Stock Purchase Agreement dated July 20, 1998 is in the amount $571,520.40." (5/30/00 Letter Agreement at 1, Ex. C to McGregor Moving Decl.).

On or about January 30, 2001, McGregor sent a letter to Bates containing his calculation of the Tranche D amount, $4,860. (Ex. O to Sfakianaki Decl.). By letter dated February 5, 2001, Bates informed McGregor that KPMG would review his computation, per Section 4.1 of the Purchase Agreement. (Ex. P to Sfakianaki Decl.). On March 16, 2001, Bates sent a letter to McGregor informing him that "[b]ased on [KPMG's] review and pursuant to Section 1.5, Purchase Price Maximum and Minimum, of the Stock Purchase Agreement the calculated repayment of the Post Closing Consideration is US$1,657,520." (Ex. Q to Sfakianaki Decl. at 1). In other words, Bates contended that it had paid McGregor $1,657,520 over the minimum purchase price.

Bates' demand for repayment is based on its comparison of the amount supposedly due McGregor under the purchase price formula set forth in Section 1.2 of the Purchase Agreement with the amount actually paid McGregor in the form of the Tranche payments. (*See* Ex. Q at 2). As noted above, McGregor was paid $1,500,000 upon closing as Tranche A, which also constituted the minimum purchase price. The parties then compromised as to the amounts of Tranches B and C, which were $1,086,000 and $571,520, respectively. When the parties agreed on the amounts of Tranches B and C, they also agreed on two amounts that are relevant to the purchase price formula: ADJ.PAT 1998 and ADJ.PAT 1999; $324,600 and $464,780, respectively. Ac-

cording to Bates, the ADJ.PAT 2000 figure was *negative* $744,542. (Ex. Q at 2). Thus, plugging the numbers into the purchase price formula:

$$8 \times \frac{(324,600 + 464,780 + (-744,542))}{3} = 119,568$$

This amount, $119,568, is less than the minimum purchase price of $1,500,000, which Bates does not dispute it is obligated to pay McGregor under the Purchase Agreement. However, the total amount Bates actually paid to McGregor, calculated by adding Tranches A, B and C is:

$$1,500,000 + 1,086,000 + 571,520 = 3,157,520$$

The difference between the $3,157,520 actually paid to McGregor and the minimum purchase price is $1,657,520, the amount which Bates now seeks to be repaid. McGregor has refused to pay.

## II. The Employment Agreement

In connection with the Purchase Agreement, McGregor also entered into a three-year employment agreement (the "Employment Agreement") with BTT, Inc. Pursuant to the Employment Agreement, McGregor was to report to the Board of Directors of BTT, Inc. and to the President of Bates' Midwest Division ("Bates Midwest"). (Ex. D to Sfakianaki Decl. at 1).

In December 1997, Bates, through Bates Midwest, entered into a formal agreement with Resorts Condominiums International ("RCI") entitled "Agreement Regarding Outsourcing and Creative Services" (the "Bates/RCI Contract"), which made Bates the "Agency of Record" for RCI. (Ex. T to Sfakianaki Decl.). In or around February 1998, RCI's Chief Executive Officer, Steve Miller, also entered into a formal agreement with McGregor's former company, Criterion (the "Criterion/RCI Contract"). (Exs. U, V, W to Sfakianaki Decl.). In addition, RCI entered into a public relations agreement with Criterion through Steve Miller. (Ex. H to Sfakianaki Decl.). Thus, the acquisition of Criterion by Bates

in or around July of 1998 resulted in RCI's having two separate agreements, the Bates/RCI Contract and the Criterion/RCI Contract, for advertising services with the same advertising agency, Bates and BTT, Inc.

Shortly after Bates' acquisition of Criterion (which became BTT, Inc.), RCI demanded—through the President of RCI, North America, Ronald Jackson—that Bates Midwest, headed by Dan Roman, "take the lead" on the services that the now-combined Bates/BTT, Inc. provided for RCI. This eventually led to a "collapsing" of the two contracts so that RCI only had one agreement with Bates. McGregor's counterclaims for breach of contract arise out of these events.

## DISCUSSION

### I. Summary Judgment Standard

Under Rule 56, summary judgment shall be rendered if the pleadings, depositions, answers, interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. Proc. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The substantive law determines the facts which are material to the outcome of a particular litigation. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Only when it is apparent, however, that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994).

## II. The Purchase Price

The parties have cross-moved on the issue of the amount of the purchase price to be paid to McGregor by Bates. Bates argues that the purchase price formula set forth in Section 1.2 of the Purchase Agreement governs the amount. McGregor insists that the sum of the Tranche payments constitutes the purchase price; further, he argues that because the Purchase Agreement makes no provision for repayment, he cannot be required to repay any amount over the minimum purchase price set forth in Section 1.5. Both parties urge the Court to find that the plain and unambiguous language of the Purchase Agreement supports their interpretation. Alternatively, both parties have provided parol evidence of their intentions upon entering into the agreement.

▮ The legal principles governing this Court's role in contract disputes are well settled under New York law, which governs the agreements at issue here. "The primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.' " *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir. 1993) (citation omitted). "In interpreting contractual language, a court must accord the words of the agreement a 'fair and reasonable meaning', which includes consideration of 'not merely literal language, but whatever may be reasonably implied therefrom'." *Telemundo Group, Inc. v. Alden Press, Inc.,* 580 N.Y.S.2d 999, 1000, 181 A.D.2d 453, 453 (1st Dep't 1992) (quoting *Sutton v. East River Sav. Bank,* 55 N.Y.2d 550, 555, 450 N.Y.S.2d 460, 463, 435 N.E.2d 1075, 1078 (1982)).

▮ The determination of whether a contract is ambiguous is a question of law reserved for the court. *See Sayers* at 1094; *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990). "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " *Sayers,* 7 F.3d at 1095 (quoting *Walk–In Medical Ctrs., Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987)(internal quotation marks and citation omitted)). Conversely, no ambiguity exists when the language employed has

"a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Sayers,* 7 F.3d at 1095 (quoting *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978) (quotation marks omitted)).

A court should analyze clauses in the context of the entire agreement to avoid rendering an individual provision superfluous. *See id.* Parties to a contract may not create an ambiguity merely by urging different interpretations of the language in question. *See Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). If an ambiguity exists, however, extrinsic evidence of the parties' intent may be considered when construing the contractual language. *See Sayers,* 7 F.3d at 1095.

Here, looking first only to the language of the Purchase Agreement and the Letter Agreements, it appears that the parties did not contemplate the possibility that the amount paid to McGregor through the Tranche payments would be greater than the amount due under the purchase price formula. The agreements contain no express provision requiring repayment, nor do they provide for any sort of security to ensure repayment of any excess amount, through escrow or the like. While Bates concedes these points, it nonetheless urges the Court to imply a repayment obligation. According to Bates, because Section 1.2 of the Purchase Agreement provides that the "Purchase Price" will constitute the "full consideration" for McGregor's stock, the necessary implication is that any amount paid to McGregor over the purchase price must be returned to Bates. By contrast, McGregor argues that the lack of any repayment provision speaks for itself and that "[s]imple logic dictates that no company, let alone a national advertising agency experienced in acquisitions like Bates, would pay millions of dollars over a period of three years without providing for some security to ensure the availability of funds for repayment." (McGregor's Memorandum in Support of his Motion for Summary Judgment ("McGregor's Moving Memo.") at 2). Reading the language of the Purchase Agreement in the context of the entire transaction here, I find it is ambiguous with respect to whether McGregor is obligated to repay Bates.

The extrinsic evidence presented by the parties on the issue of repayment provides little assistance in determining what the parties actually intended. Both parties have submitted affidavits from the lawyers and other individuals involved in drafting the Purchase Agreement, which give conflicting accounts of what occurred with respect to negotiations on a potential repayment obligation on the part of McGregor. At this point in the case, given that "conflicting extrinsic evidence of the contracting parties' intent exists, creating a genuine issue of material fact," a grant of summary judgment to either party on this issue is inappropriate. *Sayers,* 7 F.3d at 1096.[1]

## III. Unjust Enrichment

McGregor has also moved for summary judgment on Bates' alternative claim to recover the amount it allegedly overpaid McGregor on the basis of unjust enrichment. This claim must fail because there is a contract between the parties that covers the disputed subject matter. *See*

---

1. On the subject of extrinsic evidence, Bates has moved by letter brief to strike the declaration of David C. Wiener, submitted by McGregor in support of his motion for summary judgment. I decline to rule on this issue at this time. However, Bates may renew its motion at a later date if it deems it necessary to do so.

*Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (citations omitted). Bates rests its claim on the fact that there is no specific repayment provision in the Purchase Agreement, relying on *Strauss Paper Co. v. RSA Executive Search, Inc.,* 688 N.Y.S.2d 641, 260 A.D.2d 570 (2d Dep't 1999), where the Appellate Division affirmed summary judgment on the theory of unjust enrichment even though there was a contract between the parties. In this case, however, the Purchase Agreement specifically addresses the amount to be paid McGregor—the true subject of the dispute here, even if it is framed as repayment to Bates—which precludes a claim for unjust enrichment. *See Wertheim Schroder & Co. v. Avon Prods., Inc.,* No. 91 Civ. 2287, 1993 WL 126427, at *16, 1993 U.S. Dist. LEXIS 6184, at *48 (S.D.N.Y. Apr. 1, 1993) ("It is axiomatic that a claim for unjust enrichment is unavailable where there is an express written agreement between those parties which covers the same specific subject matter for which the implied agreement is sought.") (collecting cases). Accordingly, McGregor's motion for summary judgment on Bates' unjust enrichment claim is granted.

## IV. Counterclaims

Bates has moved for summary judgment on McGregor's counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and unjust enrichment.

### A. Breach of Contract and Implied Covenant of Good Faith and Fair Dealing

McGregor alleges that Bates breached both the Purchase Agreement and the Employment Agreement by, *inter alia,* cancelling and renegotiating the RCI contract "without McGregor's input and consent." (Answer and Counterclaims ("Counterclaims") ¶ 57, Ex. C to Sfakianaki Decl.). In addition, McGregor alleges that Bates' failure to respond to his "numerous attempts" to address Bates' alleged breach and other matters constitutes a breach of the implied covenant of good faith and fair dealing inherent in both the Purchase and Employment Agreements. (*Id.* ¶¶ 64–65).

With respect to the breach of contract claim, McGregor relies on Section 4.10 of the Purchase Agreement, which provides in relevant part, "[n]otwithstanding any term of this Agreement apparently to the contrary, after Closing, Purchaser [Bates] may reject any client or proposed client of the Company [Criterion] at any time and for any reason, *after consultation with the Stockholder [McGregor]."* (Purchase Agreement § 4.10, Ex. A to Sfakianaki Decl.) (emphasis added). McGregor argues that Bates did not consult with him in accordance with this provision with respect to the renegotiation of Bates' contract with RCI, specifically, the collapsing of the Criterion/RCI and the Bates/RCI contracts. Although McGregor admits that he knew the Criterion/RCI agreement and the Bates/RCI contract might be combined—indeed, McGregor wrote a memo to the CEO of RCI containing his thoughts on this very matter (*see* Ex. F to the Declaration of William J. McGregor in Opposition to Bates' Motion for Partial Summary Judgment ("McGregor Opp. Decl."))—he argues that he was not "consulted" as required by the Purchase Agreement. In support of this argument, McGregor references the deposition of Dan Roman, President of Bates Midwest, stating that Roman "admitted in his deposition that he signed the December 18, 1998 agreement with RCI ... without even telling McGregor,

let alone consulting him." (McGregor's Memorandum in Opposition to Bates' Motion for Partial Summary Judgment at 9). In fact, the excerpt from Roman's deposition attached to McGregor's opposition declaration completely belies McGregor's claim, as do McGregor's own contemporaneous writings.

Roman testified that at a meeting with RCI's President, Ron Jackson, Roman was given an ultimatum: accept a collapsed contract that terminated the Criterion/RCI agreement or lose the opportunity to do business with RCI. (Deposition of Daniel Roman ("Roman Dep.") at 189–90, Ex. H to McGregor Opp. Decl.). After further discussion with Jackson, Roman testified that he "accepted" the collapsed contract. (*Id.* at 193). Although Roman stated that he could not recall whether he informed McGregor of his decision to accept the new contract (*id.* at 194), apparently referring to the period immediately following the meeting with RCI, Roman went on to testify that at some point after the meeting but *before* the contract was executed he did discuss the new contract with McGregor and told McGregor what had happened at the meeting. (*Id.* at 195–96). Roman went on to testify that McGregor was "very upset" by the news and talked to Roman about the implications of the new contract on his "earn-out." (*Id.* at 197). As noted above, McGregor addressed similar concerns in a memo to RCI's CEO, corroborating Roman's recollection. In addition, McGregor also admits that he sent a fax to Roman attaching various provisions of the Criterion/RCI agreement that he felt "should be taken into consideration in any negotiations." (McGregor Opp. Decl. ¶ 13 and Ex. G). Later on in the deposition, in a section not included in McGregor's excerpt, Roman testified that when he received a draft of the new RCI agreement, he showed it to McGregor and got comments from McGregor on the draft. (Roman Dep. at 207, Ex. R to

Sfakianaki Decl.). Thus, the record indicates that McGregor was indeed consulted about the RCI contract before it was executed. Accordingly, summary judgment is granted to Bates on McGregor's breach of contract counterclaim with respect to the "consultation" provision of Section 4.10 of the Purchase Agreement.

McGregor's remaining arguments on his breach of contract claim also relate to the RCI contract and are, to a certain extent, duplicative of his "consultation" claim. McGregor alleges that Bates' "unilateral termination" of the RCI contract breached a provision of Section 4.10 of the Purchase Agreement which gave him the "right to direct any vacation ownership advertising business either to the Company [Criterion] or to the Bates Travel and Tourism division in Indianapolis." (Purchase Agreement § 4.10, Ex. A to Sfakianaki Decl.). In addition, McGregor alleges that Bates breached the following provision of the Employment Agreement: "As President, the Executive [McGregor] will be responsible for running the Company [BTT, Inc.] and the [BTT] Division, including hiring, firing and day to day management of the Company and the Division, subject to Bates' policies and guidelines." (Ex. D to Sfakianaki Decl. at 1). As noted above, however, the final sentence of Section 4.10 of the Purchase Agreement provides, "[n]otwithstanding any term of this Agreement apparently to the contrary, after Closing, *Purchaser [Bates] may reject any client or proposed client of the Company [Criterion] at any time and for any reason,* after consultation with the Stockholder [McGregor]." (Purchase Agreement § 4.10, Ex. A to Sfakianaki Decl.) (emphasis added). This provision vitiates McGregor's remaining arguments relating to the RCI contract. Given the facts in the record discussed above and the agreements themselves, no rational factfinder could conclude that Bates breached the provi-

sions of Purchase Agreement or the Employment Agreement relied on by McGregor. Accordingly, summary judgment is granted to Bates on McGregor's counterclaim for breach of contract.

■ With respect to his counterclaim for breach of the implied covenant of good faith and fair dealing, McGregor alleges that from January to April 1998 he wrote to various individuals at Bates "concerning the matters discussed herein" (Counterclaims ¶ 64), apparently referring to the alleged breaches committed by Bates. McGregor contends that Bates' failure to respond to his inquiries or concerns constitutes a breach of the implied covenant of good faith and fair dealing. (*Id.*). As Bates points out, "McGregor's counterclaims all rely upon the renegotiation of the RCI contracts." (Bates Moving Memo. at 12). Indeed, the allegations relating to McGregor's claim for breach of the implied covenant of good faith and fair dealing mirror the facts alleged with respect to McGregor's breach of contract claim in connection with the Purchase Agreement; that is, Bates' alleged failure to consult with McGregor before terminating the Criterion/RCI contract. New York law does not recognize a separate cause of action based on the implied covenant of good faith and fair dealing under these circumstances and, therefore, this counterclaim must be dismissed as duplicative. *See Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002) ("New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *Cary Oil Co. v. MG Refining and Marketing, Inc.,* 90 F.Supp.2d 401, 419 (S.D.N.Y. 2000) ("Under New York law, a claim for breach of the implied covenant will be dismissed as duplicative if the conduct allegedly violating the implied covenant is also the predicate for breach of the under-lying contract."). Moreover, the relief sought by McGregor on the breach of the implied covenant of good faith and fair dealing claim is "intrinsically tied to the damages allegedly resulting from the breach of contract," and thus, "there is no separate and distinct wrong that would give rise to an independent claim." *ARI & Co. v. Regent Int'l Corp.,* 273 F.Supp.2d 518, 522–23 (S.D.N.Y.2003) (quoting *Alter v. Bogoricin,* No. 97 Civ. 0662, 1997 WL 691332, at *7, 1997 U.S. Dist. LEXIS, at *21 (S.D.N.Y. Nov. 6, 1997) (quotation marks omitted)). Accordingly, summary judgment is granted to Bates on this claim.

Having granted summary judgment to Bates on McGregor's breach of contract counterclaim, Bates' argument with respect to calculation of damages is moot.

B.  Fraud

McGregor's fraud claim is based on "material misrepresentations and omissions" allegedly made by Bates in order to induce McGregor to enter into the Purchase and Employment Agreements. (Counterclaims ¶¶ 68–69). Even assuming that McGregor's allegations are sufficient to pass Rule 9(b) muster, summary judgment is appropriate on his fraud claim.

■ To the extent that McGregor alleges fraudulent inducement to enter into the Employment Agreement, his claim is foreclosed by the language of the Agreement itself. The Employment Agreement, by its terms, is governed by Georgia law, under which an alleged victim of fraudulent inducement may either affirm the contract and sue for breach or rescind and sue in tort. *See Velten v. Lippert,* 985 F.2d 1515, 1522 (11th Cir.1993); *Blaske v. Provident Life and Accident Ins. Co.,* 264 F.Supp.2d 1212, 1213 (N.D.Ga.2003). However, "[e]ven if the victim chooses to affirm the contract," as McGregor has done here by choosing to sue for breach,

"he may nevertheless obtain fraud damages as long as he does nothing to waive the fraud damages." *Velten*, 985 F.2d at 1522. Such waiver occurs if the contract affirmed by the victim contains a merger clause that expressly provides that the contract constitutes the entire agreement between the parties and/or that no other representations or agreements exist that are not included in the contract. *Id.* The merger clause contained in the Employment Agreement is sufficient to waive McGregor's right to fraud damages. (*See* Ex. D to Sfakianaki Decl. at 7 ("This Agreement constitutes the entire understanding among the parties hereto as to the subject matter covered herein, and all prior understandings and agreements are merged herein and succeeded hereby.")). Accordingly, McGregor cannot recover for fraud in connection with the Employment Agreement.

To the extent that McGregor alleges fraudulent inducement to enter into the Purchase Agreement, which is governed by New York law, his claim is foreclosed under the well-settled principle that "a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." *Rocanova v. Equitable Life Assurance Soc.*, 83 N.Y.2d 603, 614, 612 N.Y.S.2d 339, 343, 634 N.E.2d 940, 944 (1994); *see New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 288, 662 N.E.2d 763, 768 (1995) ("where a party is merely seeking to enforce its bargain, a tort claim will not lie"). McGregor alleges that Bates' "misrepresentations and omissions" include statements or promises that (1) McGregor would act as Director of BTT; (2) McGregor would act as President of BTT; and (3) McGregor would be in charge of the day-to-day operations of BTT. (Counterclaims ¶ 68). These three promises mirror provisions in the Employment Agreement (Ex. D to Sfakianaki

Decl. at 1), which was executed in conjunction with and is incorporated by reference into the Purchase Agreement. Therefore, because McGregor is alleging nothing more than that Bates did not intend to follow through on its contractual obligations under the Purchase Agreement, any fraud claim relating to these misrepresentations cannot proceed.

The fourth misrepresentation alleged by McGregor is that Bates promised to assist him in cultivating existing and new business in the United States and abroad. (Counterclaims ¶ 68). McGregor argues that this misrepresentation is collateral or extraneous to the agreements and should not be dismissed. *See Weiss v. La Suisse*, 69 F.Supp.2d 449, 459 (S.D.N.Y.1999) (to maintain a viable claim for fraud, a misrepresentation must be "collateral or extraneous" to the agreement between the parties); *International Cabletel Inc. v. Le Groupe Videotron Ltee*, 978 F.Supp. 483, 487 (S.D.N.Y.1997) (citing, among others, *OHM Remediation Servs. Corp. v. Hughes Environmental Sys., Inc.*, 952 F.Supp. 120, 123 (N.D.N.Y. 1997) ("if the fraud claim is based on an agreement not integrated into the contract at issue, such as a collateral oral agreement, the plaintiff may maintain a claim for fraud simultaneously with the breach of contract claim")).

McGregor contends that "[t]he existence of these discussions [about expanding the business] and McGregor's plans for [the same] was [sic] memorialized in a letter to Bates' Chairman at the start of the acquisition negotiations." (McGregor Opp. Memo. at 14). First of all, the letter relied on was authored by McGregor, not Bates, and contains no evidence of promises made by Bates. (Ex. 1 to Declaration of John A. Damico). Secondly, the letter and any concurrent discussions cannot serve as a basis for a fraud claim because they con-

cern the same matter as the terms of the Purchase Agreement, that is, Bates' acquisition of Criterion and the development of the business thereafter. *See About.Com, Inc. v. Targetfirst, Inc.,* No. 01 Civ. 1665, 2002 WL 826953, at *2, 2002 U.S. Dist. LEXIS 7770, at *8–*9 (S.D.N.Y. Apr. 30, 2002). Moreover, Section 9.12 of the Purchase Agreement is a merger clause which provides that the Agreement "embodies the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to [the transactions contemplated by the Agreement]." (Purchase Agreement § 9.12, Ex. A to Sfakianaki Decl.). Therefore, any binding representation made by Bates before the Purchase Agreement is either incorporated into the Agreement or superseded by the Agreement, not collateral or extraneous to the Agreement, and cannot serve as the basis for a fraud claim. *Id.,* 2002 WL 826953, at *2, 2002 U.S. Dist. LEXIS 7770, at *9. Accordingly, summary judgment is granted to Bates on McGregor's fraud counterclaim.

### C. Unjust Enrichment

McGregor alleges that Bates has refused to provide him "the full compensation due to him under the Stock Purchase Agreement," and that, consequently, "Bates has been unjustly enriched at McGregor's expense." (Counterclaims ¶ 73). McGregor's claim fails for the same reasons stated above with respect to Bates' claim for unjust enrichment. Accordingly, summary judgment is granted to Bates on McGregor's counterclaim for unjust enrichment.

### CONCLUSION

For the above-stated reasons, McGregor's motion for summary judgment (docket no. 21) is granted as to Bates' claim for unjust enrichment and denied as to all other claims. Bates' motion for summary judgment (docket no. 19) is granted as to McGregor's counterclaims and denied as to all other claims. Counsel shall confer and inform the Court by letter no later than October 10, 2003 as to the steps necessary to resolve this action.

SO ORDERED