**Beatrice BAUM Plaintiff,**

v.

**COUNTY OF ROCKLAND, Rockland Community College, and Dr. Thomas Voss, individually and as College President Defendants.**

**No. 03 CIV.5987 CM.**

United States District Court, S.D. New York.

Sept. 22, 2004.

Scott A. Korenbaum, Esq., New York City, for Plaintiff.

Charlotte G. Swift, Jason & Nesson, LLP, Chestnut Ridge, NY, for Defendants.

## DECISION ON OUTSTANDING MOTIONS FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Plaintiff, Beatrice Baum, filed an age and disability discrimination charge with the Equal Employment Opportunity Commission ("EEOC") against her employer Rockland Community College ("RCC") in May 2001. The parties agreed to settle that claim in September 2003, but the settlement unraveled. Plaintiff thereafter filed this action against RCC and Dr. Thomas Voss in his individual and official capacity as President of the College.

Plaintiff's First and Second Claims for Relief sound in breach of contract, for violation of the settlement agreement. Her Third Claim for Relief alleges that defendants retaliated against her in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623, et. seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. In her Fifth and Sixth Claims for Relief, plaintiff alleges that defendants violated 42 U.S.C. § 1983 in that they denied her equal protection and retaliated against her in violation of the First Amendment.[1]

Plaintiff has moved for partial summary judgment on her contract claims, and seeks to amend her complaint to join Rockland County as a party defendant and to add a claim for violation of Due Process against all defendants. Defendants have cross-moved for summary judgment on all claims.

For the following reasons, plaintiff's motion for summary judgment on the contract claims is granted, but defendants'

motion for summary judgment dismissing the rest of plaintiff's claims is also granted. Plaintiff's motion to amend her complaint to add a new claim is denied. When judgment is entered it will be entered against Rockland County, which is the proper party defendant in this case.

## STATEMENT OF FACTS

Except where noted, the following facts are undisputed.

### Background to the Initial Complaint

Plaintiff was hired by the College in 1986 to work as a Clerk–Typist, the position she held until her retirement in December 2002. According to the job description, a clerk-typist is required to do general clerical work, which involves ordering, recording, tabulating or otherwise processing materials, in addition to maintaining and distributing office supplies and answering phone calls. (Def.Ex. 22.) In order to perform these duties, the employee must exhibit the ability to understand and carry out simple oral and written directions, maintain records and file both alphabetically and numerically. (*Id.*) Between 1999 and 2000 plaintiff's supervisors became concerned that plaintiff was unable to perform these functions because she tended to get confused and needed lots of assistance. Certain individuals began pressuring her to retire.

On or about May 30, 2001, plaintiff filed a claim against the College with the EEOC alleging that she had been discriminated against on the basis of her age and her "perceived" disability (dementia). Up until then, plaintiff had been working at the Haverstraw Extension Center. Haverstraw was closed shortly after she filed the complaint, and plaintiff was transferred to

---

1. Plaintiff's Fourth Claim for Relief, for violation of § 296 of the New York Executive Law, was dismissed.

the Graphics Department of the College where she worked until her retirement.

After the County received notice of the complaint, Margot Vazquez, the Director of the Rockland County Office of Employee Rights and Equity Compliance, opened an investigation that lasted through May 2002. Vazquez interviewed plaintiff and her supervisors, who indicated that they were concerned with plaintiff's work performance and her ability to understand directions. (Def. Ex. L, Vazquez Tr. 64:14–65:9.) After months of investigation and meetings, Vazquez concluded that the College and its employees had discriminated against plaintiff in violation of state and federal law, by not appropriately handling Mrs. Baum's situation and her supervisor's complaints. (Def.Ex. 3.) She was especially concerned that the College had not followed the procedures set forth in § 72 of the New York Civil Service Law, which permits a government employer to send a civil service employee for a medical evaluation (a " § 72 Exam") if the appointing authority believes the employee cannot perform the duties of her position, before pressuring her to retire. (Vazquez Tr.: 161:3–162:11.)

In the overview of her final report, dated May 14, 2002, Vazquez wrote, "Having perceived Ms. Baum to have a disability from 1999 to the present, which substantially effected her ability to perform her essential job functions, rather than assessing or evaluating her condition for possible accommodation under ADA or remedial action pursuant to Civil Service Law, Section 72, the supervisors with the knowledge of President and Vice President, chose to harass and punish [plaintiff] in an attempt to force her to retire." (Def.Ex. 3, p. 1.) She detailed her specific findings in the report and made several recommendations, including a recommendation that Dean Kodgis be disciplined. Sometime in June or July she met with the Board,

including Voss, to present her findings. (Def. Ex. L, Vazquez Tr.: 38:2–22.)

The College was aware of Vazquez's findings well before May 2002. As early as October 2001, Vazquez met several times with Donald Generals, the College Administrator, and others (including Voss, once he became President) to discuss her findings. In these meetings, she expressed concern that the College did not have appropriate procedures in place for handling situations like plaintiff's. (Def. Ex. L, Vazquez Tr. 130:2–131:19, 161:3–162:11.) According to defendants, it was in response to Vazquez's recommendation that the college refer Baum for a § 72 Exam. (Def. Rule 56.1 ¶ 28.) To that end, Generals sent a letter dated February 6, 2002 to the Commissioner of Personnel, asking that the office direct a § 72 Exam for Baum to determine whether the "stated deficiencies in Mrs. Baum's work may be related to a physical or mental disability within the meaning of § 72 of the Civil Service Law." (Def.Ex. 27.)

*Settlement*

Mrs. Baum and the College agreed to mediate their dispute under the auspices of the EEOC. Deborah Reik, EEOC Mediator, conducted the first mediation on May 1, 2002. Plaintiff attended the session with her husband, Gerhard Baum, and her son Marvin Baum. Jeffrey Fortunato, the Deputy County Attorney, Vazquez, and E. Lewis Jeffries, the Insurance Coordinator for Rockland County, attended the mediation session on behalf of the College and Rockland County.

At the meeting, the College acknowledged that Mrs. Baum's rights had been violated. (Def. Ex. L, Vazquez Tr. 201:6–205:19; B. Baum Opp. Decl. ¶ 35.) The parties discussed the need to send Mrs. Baum for a § 72 exam, and a date when she might retire. Defendants state that they wanted plaintiff to retire soon be-

cause there was concern that if she stayed, the County would have to go forward with the § 72. According to the defendants, Baum agreed to retire in July, and it was based on this that they decided to postpone the § 72 Exam.[2] (Def. 56.1 ¶ 52–53.) Plaintiff denies this. She states that she understood that Fortunato wanted her to retire as quickly as possible, but that she did not agree to retire in July. (Baum Opp. Decl. ¶ 26.) Plaintiff also testified that she and her family were extremely upset about the possibility of her having to undergo a medical exam. (Baum Tr. 54–55.) During the meeting, plaintiff also stated that she would want an opportunity to speak with members of the College administration and board to inform them about what had happened to her.

The May 1 session did not result in a settlement, but the parties continued to conduct settlement discussions, indirectly, with the assistance of Deborah Reik and Michael Bertty from the EEOC. Plaintiff's son acted as her representative in discussions with the EEOC. Plaintiff herself was not a party to these later discussions. The parties eventually agreed that plaintiff would meet with the President of the College, Dr. Thomas Voss, and the Chairman of the Board, Charles Wasserman, to discuss her concerns, but she would not be able to meet with the entire board. The Baums met with Voss, Wasserman and Fortunato on July 22, 2002. Mrs. Baum raised several concerns at the July 22 meeting. She spent a great deal of time discussing her concerns about the health and safety conditions at the Haverstraw facility where she had worked, and showed everyone pictures of toxic mold at the site.[3] She also told them that she had been the victim of discrimination and had been badly harassed by Dean Kodgis. She expressed her "shock" that the College had promoted him when they knew how he had treated her.[4]

Shortly after this meeting, plaintiff was invited to apply for the Retirement Incentive Program (RIP), for which she was eligible between October 2, 2002 and December 29, 2002. In light of this, Mrs. Baum decided that she would not retire before her eligibility period, but agreed to retire on October 4, 2002. On August 2, 2002 a series of letters were exchanged between the Baums, the College and the EEOC regarding the possibility of Mrs. Baum's retiring on October 4. The College rejected the offer. In an August 9 voicemail for Marvin Baum, Reik explained the College's position, and its desire to have Baum retire as soon as possible because "she's litigious." (M. Baum Opp. Decl. ¶ 22–25; Ex. A.)

After the October 4th offer was rejected, Mrs. Baum decided she would retire at the end of the RIP eligibility period on December 29, 2002, and "keep her dignity." The Baums notified the college on August 12, 2002 and Reik on August 19 of Mrs. Baum's decision. (Def.Ex. 36.)

---

2. The timing of some of these events is unclear, but in early June, Voss wrote to Generals requesting that plaintiff undergo a § 72 Exam. On June 10, 2002 that request was approved and the Department obtained the services of Richard Kole, M.D. to perform the exam. (Def. 56.1 ¶¶ 61–66, Def. Ex. 22.) However, the College only officially notified Mrs. Baum by letter dated October 8, 2002 that she was being required to attend an examination. (Def.Ex. 14.) It appears that in the interim the parties were still negotiating.

3. The College stopped holding classes at Haverstraw at the end of May 2002, and later closed the facility entirely.

4. In her moving papers, plaintiff also states that she discussed her concern that she had been discriminated against on the basis of her religion; however, at her deposition, she did not mention this when asked to discuss *everything* she spoke about at the meeting.

Settlement discussions appeared to be dead, but the County, through Terry Grosselfinger, Chief of Staff to the County Executive, Scott Vanderhoef, made one last push. On September 16, Bertty (the other EEOC mediator) informed Marvin Baum that the College had agreed to Mrs. Baum's retirement date of December 29, 2002. According to Baum, there was no mention of a § 72 Exam.

Bertty informed Voss that the Baums had accepted the settlement offer. Voss in turn informed Fortunato of the settlement in a memo dated September 16. Voss wrote that the settlement:

"includes a payment of $65,000, the giving of a general release, and other terms and conditions previously disclosed to you, effective on her retirement date of 12/29/02." In addition, in accordance with the Board of Trustees' latest directive, Mrs. Baum will be subjected to an immediate § 72 examination to determine her fitness for duty until she actually retires. Mrs. Baum is aware that the examination will be conducted as soon as possible.

The EEOC will forward me signed copies of the Settlement Agreement once Mrs. Baum has executed same."

(Def.Ex. 37.)

The parties' agreement was memorialized in a Settlement Agreement with an effective date of September 17, 2002 ("Agreement"). The Agreement provides:

1. In exchange for satisfactory fulfillment by Rockland County Community College (Respondent) of the promises in this agreement, Beatrice K. Baum (Charging Party) agrees not to institute a lawsuit under the Americans with Disabilities Act (ADA) and the Age Discrimination in Employment Act (ADEA), based on EEOC Charge Number 160 A. 1 2032.

2. Further, the parties agree that submission of this agreement to the EEOC will constitute a request for closure of EEOC Charge Number 160 A. 1 2032.

3. It is understood that this agreement does not constitute an admission by the Respondent of any violation [of the ADA or ADEA].

4. Respondent agrees that there shall be no discrimination or retaliation in violation of the ADA or the ADEA against any person because of Charge Number 160 A. 1 2032 or actions relating to that charge...

5. The parties agree that the EEOC is authorized to investigate compliance with this agreement...

6. The parties agree that this agreement shall be kept confidential except that it may be specifically enforced in court and may be used as evidence in a subsequent proceeding...

7. This document, together with a general release prepared and signed by the parties, constitutes a final and complete settlement of the entire agreement between the parties concerning EEOC Charge 160 A1 2032.

8. In exchange for satisfactory fulfillment by the charging party of the promises made in this agreement, Respondent and Charging Party agree[ ] to:

A. Respondent will pay the Charging Party $62,500.00 as non-income compensatory damages for physical pain and suffering. Payment will be made upon the expiration of the ADEA review and revocation period referenced below, and upon the effective date of Mrs. Baum's retirement. [redacted]. At that point, she will retire and

on the effective date of her retirement, receive her payment under this agreement.

B. Mrs. Baum will receive a copy of the recommendation made by Margo Vazquez, Director of Employee Rights and Equality Compliance for the County of Rockland to the Board of Trustees of Rockland Community College concerning changes that should be made as a result of the issues raised by Mrs. Baum's charges.

C. On her last day of employment, which will be December 29, 2002, Mrs. Baum will receive a Certification of Appreciation from the College for her contributions as an employee. Mrs. Baum will elect early retirement effective December 29, 2002.

D. Both parties agree that Charging Party will be allowed to share the text of this agreement with her Accountant...

9. [notification of Older Workers Benefit Protection Act]

In reliance on the promises made in paragraphs (1), (2), (4), (5), (6), (7) and (8), EEOC agrees to terminate its investigation and not to use the above referenced charges as a jurisdictional basis for a civil action under the ADEA.

(Def.Ex. 39.) The Agreement was signed by Mrs. Baum, Fortunato, on behalf of the County, Reik, Bertty and Spencer Lewis, Jr. the District Director for the EEOC.

There is no mention of a § 72 Exam in the Agreement. However, defendants contend that plaintiff was aware, as of September 17, that a § 72 Exam would be conducted as soon as possible. (Def. 56.1 ¶¶ 88–89.) In support of this statement,

they point to Voss' September 16 memo that says Baum will be subject to a § 72 Exam immediately. (Def.Ex. 37.) Neither plaintiff nor the EEOC mediators were copied on this memo, and plaintiff denies any knowledge that she was expected to go through with one after the settlement. But she did admit in her deposition that she knew as early as May that the College wanted her to be examined, and that she also knew in August (based on statements from Reik) that the County had decided to move forward with the process. (Def. Ex. K, B. Baum Tr.: 56:6–58:9, 75:10–19.) [5]

On September 18, the day after plaintiff signed the Agreement, plaintiff and her son went to the bank to sign a general release in the presence of the notary. Plaintiff took a form general release that the County had given Marvin Baum on June 13, which he understood had been provided by the College. The form states:

"TO ALL WHOM THESE PRESENTS SHALL COME OR MAY CONCERN, KNOW THAT [blank space] as RELEASOR in consideration of the sum of [blank space] ($) received from [blank space] as RELEASEE, receipt of which is hereby acknowledged, releases and discharges [blank space] the RELEASEE, RELEASEE'S heirs... from all actions, causes of action, suits, ... and demands whatsoever in law, admiralty or equity, which against the RELEASEE, the RELEASOR, RELEASOR's heirs...ever had, now have or hereafter can, shall or may, have for, upon or by reason of *any matter...from the beginning of the world* to the day of the date of this RELEASE."

(Swift Opp. Decl. Ex. F)(emphasis added). In the presence of the notary, plaintiff

5. It is unclear exactly what "move forward" means. She was asked "So, you knew as of August 9th that Deborah Reik was advising you that the County had advised her that they were moving forward on the § 72?" and she responded, "that's correct."

filled in her name as the Releasor, $62,500 in the parentheses as the amount of the consideration and Rockland Community College as Releasee. The form, which identified the releasor, the releasee, and the consideration, was notarized and dated. This much defendants do not dispute.

According to plaintiff and her son, Marvin Baum requested a copy of the notarized document, and after he and his mother reviewed it, they immediately realized that Mrs. Baum had neglected to fill in some of the blanks on the form release. So, in the presence of the notary, Mrs. Baum wrote "Sixty-two Thousand Five Hundred Dollars" in the space before the parenthesis in which she had written the amount, and in the releases and discharges area she wrote "Rockland Community College and the County of Rockland". (M. Baum Decl., ¶¶ 10–11, Ex. C; B. Baum Decl. ¶¶ 12–14.) Significantly, the blanks that were filled in contained no information that was not already on the release as originally signed and notarized.[6]

Marvin Baum then asked for, and was given, a copy of the revised release. Once the release was signed and sent off to the EEOC, Mrs. Baum believed the settlement was complete and that she would receive $62,500 upon retirement. (B. Baum Decl. ¶ 15.)

Later that day, Marvin Baum faxed the release to the EEOC. Only later—presumably during discovery—did he realize that he may have faxed a copy of the incomplete release (Baum version 1) to the EEOC. (M. Baum Decl. ¶¶ 9–12; B. Baum Decl. ¶¶ 12–15.)

The EEOC forwarded Fortunato a copy of the general release signed by Mrs. Baum before the changes had been made (version 1). In his declaration, Fortunato acknowledges receipt of this release, but states that it was "non-conforming" in that it did not release any person or entity (an obviously incorrect statement) and had an effective date of September 18, 2002. (Fortunato Decl. ¶¶ 7, 10, 11.) He further states that he "rejected" the release on behalf of the defendants, and that the defendants never asked plaintiff, or expected plaintiff, to execute a general release until the date the general release was due—December 27. (*Id.* ¶ 13–14.) There is no contemporaneous evidence that Fortunato acknowledged receipt of this release in September 2002, and no contemporaneous evidence that he gave plaintiff any indication he had formally rejected it. He did not write a letter to either the EEOC or plaintiff or make any formal rejection of the release.

As discussed below, defendants contend that the changes plaintiff made to the form release after it was notarized invalidated the release. They also argue that there is no proof (other than the Baums' testimony—which they seem to discount) that plaintiff actually made those changes in the presence of the notary, rather than at some later date. Fortunato admits that he sent the blank form release to the EEOC, but claims that it was sent as an example of an acceptable release. (Korenbaum Decl. Ex. A, Fortunato Tr.: 227:11–230:5.)

Attached to Fortunato's declaration is the general release, which he believed plaintiff was supposed to sign when she retired. (Fortunato Decl. ¶ 15; Ex. B.) Fortunato testified that Bertty had said a release did not need to be attached to the Agreement and he, Fortunato, could have it prepared for December 29 because Bertty hadn't known anyone to refuse to sign on the last day. (Korenbaum Decl. Ex. A,

---

**6.** As a matter of law, releasing RCC released Rockland County, since the College is an arm of the County.

Fortunato Tr.: 347:4–348:22.) With the exception of the date on the document and the fact that the names of the parties are typed, this release is identical to the corrected version of the September 18 release. (*Id.* Tr.: 344:3–15.)

*Events Post–Settlement*

Despite the fact that the parties had agreed to settle the case and Mrs. Baum was due to retire at the end of December, the College moved ahead with the § 72 process. On October 7, Jean Howell, an Associate Director, sent plaintiff a letter informing her that "as a result of evaluations of your work performance… it is the opinion of Dr. Thomas Voss…that you are unable to perform the duties of your position as Clerk Typist", and that she would be required to undergo a § 72 Exam "in order to determine if you should be placed upon a leave of absence for ordinary disability." (B. Baum Decl. Ex. E.) Howell attached copies of a January 2002 memo from Mary Ann Gaherty, plaintiff's supervisor between January 2001— June 2001, and a February 2002 memo from Gale Latkovic, plaintiff's supervisor in the graphics department, both of which detailed problems with plaintiff's performance. (B. Baum Opp. Decl., Ex. A.) A follow-up letter was sent the next day informing plaintiff that she should report to Dr. Kole's office on October 16.

In a letter dated October 12, 2002, Baum acknowledged the College's letter, and stated her belief that "the effort to medically 'evaluate' me and to use any "disability" to possibly end my employment just days before my retirement is *a deliberate act of retaliation against me by the County Attorney's office and is in violation of Federal Law.*" (*Id.* Ex. F)(emphasis in original.) She concluded by saying she had "no intention" of attending the medical appointment and was turning the matter

over to the EEOC. Copies were sent to Spencer Lewis, the EEOC District Director, Reik, Bertty, Vanderhoef, the County Executive, and Terry Grosselfinger, the Chief of Staff. After plaintiff did not appear for the first appointment, the County made another one and sent plaintiff notice that her failure to appear would result in disciplinary action. (Swift Reply Decl. Ex. 16.)

Dr. Kole conducted an external physical examination and a mini-mental health examination of plaintiff on November 1, 2002 (a date requested by plaintiff) in the presence of her son and husband. Dr. Kole concluded that plaintiff was fit for work, and plaintiff returned to work. She lost no pay, time or benefits during the process. Nonetheless, plaintiff states that the exam was humiliating because she had never before been examined against her will. She was also disturbed that Dr. Kole conducted a breast exam, which she did not believe was relevant to her job performance. Defendants contend that the exam was non-intrusive and appropriate in scope.

On December 27, 2002, the planned date of plaintiff's retirement, Elaine Zacher, secretary to the College President, called plaintiff to notify her that her settlement check was ready and plaintiff could pick it up.[7] When plaintiff arrived at the office, accompanied by her husband and son, Zacher told them that plaintiff needed to sign a release. Plaintiff refused to sign the release that Zacher provided. She explained that she had already signed a general release. Plaintiff claims that she offered to get the original, which she had never provided the County, but defendants deny that this offer was made.

Zacher called Fortunato, who insisted that Mrs. Baum sign the release that was

---

7. The parties agree that December 27, not December 29, was the final date agreed upon.

provided, with an effective date of December 27, 2002. With Fortunato still on the phone, plaintiff says she offered again to provide the College with the release that she had executed on September 18, 2002. However, the College refused to pay plaintiff without a release signed contemporaneous with payment. Plaintiff left the President's Office and retired without signing a second release or receiving the settlement payment.

On January 3, 2003, Plaintiff wrote the EEOC explaining what had happened since the Agreement had been signed, and asked for advice on how to handle the situation. Reik responded to plaintiff's letter and sent plaintiff a copy of the release, with the December date, for plaintiff to sign. She also noted that plaintiff had been given a copy of the release last summer, and she had reviewed it with an attorney. On February 14, Baum sent Reik the original, notarized general release that she had signed in September 2002. Reik then sent the release to Fortunato. In the cover letter, Reik explained that Baum had signed the document in September with the Settlement Agreement and faxed it to the EEOC in September, but "apparently it was not forwarded to you. I hope this clears up the problem, and that she will be paid." (Korenbaum Decl. Ex. C.)

Fortunato replied by letter dated February 19, 2002 that the release was unacceptable because "Mrs. Baum remained employed by [the College] until December 27, 2002. *The settlement agreement dated September 17, 2002, required the issuance of the general release to the County and the College on the day Mrs. Baum retired.*" (Korenbaum Decl., Ex. D.)(emphasis in original.) He enclosed another release with his letter.

In a letter dated February 27, 2003 Reik informed Baum that releases are often prepared by employers and it is "usual for those releases to give up all claims up until the date of the release, which is usually the same as or after the date of employment." (Swift Decl. In Opp. Ex. J.) In light of this, she told plaintiff "you will have to decide whether you want to sign the release and get the money or whether you want to sue them." (*Id.*)

Baum never signed a release after mid-September 2002. She has never received payment.

## DISCUSSION

### Standard for Motion for Summary Judgment

■ Rule 56(c) provides that summary judgment shall be granted where there is no "genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law," that is, where the party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, a party opposing summary judgment must point to "specific facts showing that there is a genuine issue for trial," by proffering "significant probative evidence tending to support [its] complaint." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citations omitted). The non-movant "may not rest upon the mere allegations or denials of [its] pleadings," Fed.R.Civ.P. 56(e), or upon "mere speculation or conjecture as to the true nature of the facts." *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995).

### Plaintiff is Entitled to Summary Judgment on her Contract Claims

■ The parties agree—as does the Court—that the contract in this case is not ambiguous and both have moved for summary judgment on the contract claims.

(Pl. Mem. in Opp., 9; Def. Mem., 6.) In reviewing the Agreement, I am guided by well-established principles of contract interpretation. "The primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.'" *Sayers v. Rochester Tel. Corp.,* 7 F.3d 1091 (2d Cir.1993) (quoting *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)). Whether a contract term is ambiguous is a question of law to be resolved by the court, and "evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the document." *WWW Assoc., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162–163, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990).

The dispute in this case revolves around the timing of plaintiff's performance under the Agreement—specifically, when she was supposed to sign the release in favor of the College and the County. Plaintiff contends that she properly performed under the contract when she signed a release on September 18, at or about the time she signed the Agreement. Defendants aver that it was their understanding (based on statements from the mediators) that the release would be signed on plaintiff's last day. For this reason, defendants argue that there was no meeting of the minds as to the time for plaintiff's performance, and seek summary judgment on that ground.

Plaintiff contends that she provided a satisfactory general release, and defendants breached the agreement by failing to pay her the $62,500 on her last day of work. She seeks summary judgment on her First and Second Claims for relief.

*The Agreement Does Not Require Plaintiff to Release All Claims Prior to December 29, 2002 in Order to Receive Payment*

■ When construing the respective obligations of parties to a contract, the New York Court of Appeals has held that, "In searching for the proper intent of the parties, lest form swallow substance, our goal must be to accord the words of the contract their 'fair and reasonable meaning.'" *Sutton v. East River Sav. Bank,* 55 N.Y.2d 550, 555, 450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982) (internal citations omitted). In determining the parties' "reasonable expectations," a court considers "not merely literal language, but whatever may be reasonably implied therefrom must be taken into account." *Id.; see also Bates Advertising USA, Inc. v. McGregor,* 282 F.Supp.2d 209 (S.D.N.Y.2003) (quoting *Sutton* ).

The Agreement in this case does not state an exact date on which plaintiff would tender a release, but the language of the Agreement supports plaintiff's belief that she was not required to sign a release on December 29—and release all claims through that date—in order to be paid $62,500.

The Agreement was signed to settle a *particular* claim of discrimination, EEOC Charge Number 160 A. 1 2032. It was this claim that the parties had in mind when the Agreement was executed. I of course understand a lawyer's fear that a "litigious" plaintiff might dream up some new claim—as Baum has—but the way this particular Settlement Agreement was drafted did not protect the employer against that danger.

■ Paragraph 1 clearly states that plaintiff "agrees not to institute a lawsuit under the Americans with Disabilities Act (ADA) and the Age Discrimination in Employment Act (ADEA), based on EEOC Charge Number 160 A. 1 2032." (Swift Opp. Decl., Ex. 39.) Elimination of this claim, and a threat of any lawsuit thereunder, is the gravamen of the Agreement. Paragraph 7 says, "This document [i.e. the Settlement Agreement], *together with a*

*general release* prepared and signed by the parties, constitutes a final and complete settlement of the entire agreement between the parties *concerning EEOC Charge 160 A1 2032.*" (*Id.*)(emphasis added.) As I noted in my earlier opinion, where settlement agreements call for the execution of a release in connection therewith, the release is typically executed contemporaneously. *Baum v. Rockland Community,* 299 F.Supp.2d 172, 175 (S.D.N.Y. 2003). The Agreement clearly indicates that the parties had the standard operating procedure in mind when they agreed on language to memorialize the settlement.

■ Despite defendants' statements to the contrary, there is no language in the Agreement which suggests that the release was to be executed at a later date. In particular, there is no mention of the release in paragraph 8, which, as defendants repeatedly emphasize, outlines what the parties are supposed to do in the future. Were the parties to have intended that the release be executed in the future, it would have been logical and appropriate to include that requirement as part of paragraph 8—probably in paragraph 8(C) which specifies the day on which Mrs. Baum had agreed to retire (a much negotiated point). Or, it could have been included in paragraph 8(A), where Mrs. Baum's executory duties are outlined. If Mrs. Baum was expected to provide a release to the defendants on the day of her retirement, the Agreement would say so here. Instead the release is mentioned in paragraph 7, where its execution is directly tied to the execution of the Settlement Agreement and the disposition of the EEOC charge, both of which happened in September not December.

Confirmation of this interpretation can be found in an earlier draft of the Agreement. (*See* Def. Ex. 49.) In that earlier draft, the release *is* discussed in paragraph 8. Paragraph 8A of that draft read,

"Payment will be made upon the expiration of the ADEA review and revocation period referenced below, and the signing of the general release referenced above, and upon the effective date of Mrs. Baum's retirement." (*Id.*) This language, which can reasonably be read to require execution of a release in December, was deleted from the final agreement.

■ Further, as plaintiff argues, the execution of a release on the last day of her employment would nullify the "non-retaliation" provision contained in Paragraph 4 of the Agreement, which provides, "Respondent agrees that there shall be no discrimination or retaliation in violation of the ADA or the ADEA against any person because of Charge Number 160 A. 1 2032 or actions relating to that charge..." (Def.Ex. 39.) Plaintiff contends that if she signed a general release (which is the form of release on which defendants insist) on her last day, releasing all claims that she had accrued through that day, she would have no recourse against defendants if they retaliated against her between September 18 and the date of her retirement. Paragraph 4 would therefore be rendered meaningless. Plaintiff is correct about this. Since it is a cardinal maxim of contract interpretation that an agreement should not be construed in a manner that renders any provision meaningless, defendants' proposed construction cannot be correct. *See Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174, 133 N.E.2d 688 (1956); *Summer Communications, Inc. v. Three A's Holding, LLC,* 175 F.3d 1008, 1008, 1999 WL 106216 (2d Cir.1999).

■ Defendants' interpretation is also flawed because plaintiff could not promise, in September 2002, that she would release defendants of any and all claims through December 2002, including claims that might accrue after the Settlement Agreement was signed. It is against public poli-

cy for a party to agree to release claims that have yet to accrue. *See Baum,* 299 F.Supp.2d at 175 citing *Westmoreland Asbestos Co. v. Johns–Manville Corporation,* 39 F.Supp. 117 (S.D.N.Y.1941); *see also Humana Kansas City, Inc. v. Continental Cas. Co.,* 93 Civ. 1248, 1995 WL 669241 (W.D.Mo. Nov. 8, 1995). Defendants argue that they never asked plaintiff to release future claims (e.g. to sign a release in September stating that she released them of any future claims), but only that she sign a release in December agreeing to release the County and the College for all past claims. But the form of release defendants asked plaintiff to sign in December was not limited to claims accrued through the date of the Settlement Agreement. It was a *general* release, which required plaintiff to give up all "actions, causes of actions, suits, debts . . . , and demands whatsoever, in law, admiralty or equity which against the RELEASEE, the RELEASOR . . . ever had, now have or hereafter can, shall or may, have for . . . any matter . . . *from the beginning of the world to the day of the date of this RELEASE.*" (B. Baum Decl. Ex. K.) Signing that release in December pursuant to an agreement reached in September violates public policy.

Finally, defendants argue that the EEOC, the third-party to the contract, shared their belief that the release would be signed on Baum's last day, and that Reik's February 27 letter to Baum demonstrates this agreement. Of course, where contract language is unambiguous evidence of this person's understanding is both irrelevant and inadmissible. However, Reik's letter does nothing of the sort. In that letter, Reik informed Baum that after mediation the employee "usually" signs a release on the last day. But Reik did not opine that this particular Settlement Agreement required plaintiff to sign the release on her last day of employment; and some days earlier she had opined to

defendants that plaintiff had satisfied her contractual obligations by sending the release back in September. (*See* Korenbaum Decl. Ex. C.) Thus, I cannot conclude that the EEOC mediators who assisted the negotiation necessarily shared defendants' view of the Agreement.

In sum, the Agreement, fairly read, did not require plaintiff to execute a general release of claims on December 27, 2002. The question then becomes whether plaintiff performed under the Agreement.

*Plaintiff Performed Under the Agreement*

Plaintiff had three obligations under the Settlement Agreement: refrain from bringing suit on her ADA and ADEA claims, sign a release and retire. The EEOC charge was dropped. She indisputably retired. She also signed a release. Therefore, she has fully performed under the Agreement.

Defendants attempt to raise an issue of fact concerning whether or not plaintiff properly executed the release on September 18. However, they offer no evidence (such as an affidavit from the notary) to contradict the sworn testimony of plaintiff and her son about the execution and correction of the release in front of a notary.

Defendants incorrectly argue that plaintiff never tendered a valid release—at least not until February, when performance was too late. But while the copy of the release that was initially forwarded to the EEOC was "incomplete", it was valid, even without all the blanks filled in. The document clearly states that plaintiff, in consideration of money "received from [Rockland Community College] as *RELEASEE,* receipt of which is hereby acknowledged, *releases and discharges* [blank space] *the RELEASEE, . . .* " Fairly read, the document identifies the releasee and says that plaintiff releases "the releasee." The releasee is identified as Rockland Community College. So plaintiff did tender a valid release on September 18—

even though not every blank that could or should have been filled in· was filled in. Furthermore, she tendered the release by sending it to the EEOC, which forwarded it to Fortunato. Fortunato admits receiving the release in September. Fortunato says he rejected it, but there is no .contemporaneous evidence of any formal .rejection, and he would have had no right to reject the document in any event.

■ Moreover, the corrected (really, completed) version of the release is also a valid release. Changes made to a release after it was notarized do not automatically render the document invalid, as defendants argue. *See Waible v. Dosberg*, 83 A.D.2d 983, 443 N.Y.S.2d 621 (4th Dep't 1981), *aff'd.*, 54 N.Y.2d 780, 443 N.Y.S.2d 368, 427 N.E.2d 507 (1981) (where the changes are made by the witness himself, invalidation will not result.) The other Election Law cases cited by defendants do not hold otherwise, rather those cases involve "unexplained, uninitialed changes." *See Jonas v. Velez*, 65 N.Y.2d 954, 493 N.Y.S.2d 1019, 483 N.E.2d 1151 (N.Y.1985); *Johnson v. Westall*, 208 Misc. 360, 144 N.Y.S.2d 633 (1955). Here, plaintiff was the declarant and was therefore authorized to change the document—which she swears she did in the presence of the notary. The "changes" she made added nothing to the release as originally notarized, which identified the releasor (Baum), the releasee (RCC), and the consideration for the release ($62,500). And because the Agreement does not provide a specific date by which the release needed to be tendered, delivery of the "corrected" version of the release in February also constitutes proper performance under the Agreement.

*There Was a Meeting ·of the Minds Between the Parties to Settle the EEOC Charge*

Perhaps recognizing the difficulty of proving that the Agreement called for a

release of all claims through the date of her resignation, defendants argue that they are entitled to summary judgment because there was no meeting of the minds on this issue, and thus no contract.· Defendants' argument is not persuasive.

Defendants rely on two Second Circuit cases, *Ciaramella v. Reader's Digest*, 131 F.3d 320 (2d Cir.1997) and *Sayers v. Rochester Tel. Corp.*, 7 F.3d 1091 (2d Cir.1993), neither of which addresses similar facts. In *Sayers* the court outlined general principles of contract interpretation, and in *Ciaramella* the court outlined factors to consider when determining if parties are bound to an unsigned, draft settlement agreement. In· this case, the parties had a final settlement agreement, which was memorialized in a written agreement and duly executed on or about September 17. The *Ciaramella* factors are therefore not applicable.

■ In determining whether parties entered into a contractual agreement and what were its terms, it is necessary to look at the parties' objective manifestations of agreement—in this case, the unambiguous language of the contract they signed—not any subjective intent they harbored. *See Franklin Pavkov Const. Co. v. Ultra Roof, Inc.*, 51 F.Supp.2d 204, 214–215 (N.D.N.Y. 1999) quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399, 361 N.E.2d 999, 999, 393 N.Y.S.2d 350, 351 (1977). *Scholastic, Inc. v. Harris*, 95 Civ. 176, 1999 WL 1277246 (S.D.N.Y. Nov. 29, 1999). Where parties have negotiated and memorialized an agreement in writing, the Court must do all that it can to give force to the parties' intent. Here, the purpose of the Agreement was to settle any potential claims that Mrs. Baum (or the EEOC) might pursue against the College or the County, based upon the facts plaintiff outlined in her EEOC Charge—facts that were in ex-

istence as of September 18. Mrs. Baum agreed to retire and defendants agreed to pay plaintiff a sum of money to release her EEOC claim—not any retaliation claims. This is the crux of the Agreement, and one on which there was a clear meeting of the minds.

Plaintiff is therefore entitled to summary judgment on her First and Second Causes of Action. Defendants are directed to pay plaintiff $62,500, as required by the Settlement Agreement.

## Defendants' Motion for Summary Judgment on Plaintiff's First Amendment Retaliation Claim is Granted

Defendants have also moved for summary judgment dismissing plaintiff's First Amendment retaliation claim.

■■■ In order to survive a motion for summary judgment on a First Amendment retaliation claim, plaintiff must be able to demonstrate that 1) her speech addressed a matter of public concern; 2) she suffered an adverse employment action; and 3) a causal connection existed between the speech and the adverse employment action, such that it can be inferred that her speech was a motivating factor. *Mandell v. Co. of Suffolk,* 316 F.3d 368, 382 (2d Cir.2003). Defendants argue that plaintiff has failed to meet any of these three requirements.

### *Plaintiff Engaged in Protected Speech*

■■■ The requirement that plaintiff's speech be related to a public, rather than private, concern is critical to establishing her First Amendment claim. "When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers,* 461 U.S. 138, 146, 148, 103 S.Ct.

1684, 75 L.Ed.2d 708 (1983). Whether or not a plaintiff engaged in protected speech is an issue of law for the court to decide. *Mandell,* 316 F.3d at 382.

Plaintiff claims to have engaged in protected speech on two different occasions: first, when she filed her May 2001 EEOC charge, and later in the July 22 meeting.

■■■ An employee's charge of discrimination is not itself protected speech unless it contains matters of public concern. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049 (2d Cir.1993). A review of plaintiff's EEOC charge (Swift Reply Decl., Ex. 1) shows that it deals entirely with personal complaints about her lack of training, poor supervision and her belief that she was being harassed. These complaints are personal in nature and do not constitute matters of public concern.

Plaintiff testified that at the July 22 meeting she discussed her concerns about the safety of the Haverstraw facility at length and told Wasserman and Voss that she had been discriminated against by Dean Kodgis. Defendants argue that these complaints, which were discussed in a private meeting, are also of a personal nature and are not issues of public concern.

With respect to the Haverstraw site defendants claim plaintiff's complaints were focused on how the hazardous conditions impacted *her,* and are therefore not protected. *See Cobb v. Pozzi,* 352 F.3d 79 (2d Cir.2003) (public employee's complaint of dissatisfaction with her working conditions does not fall under the rubric of matters of public concern). However, plaintiff testified at deposition (and defendants acknowledge this in their brief) that she told Wasserman and Voss "these were toxic situations in the building that we were all in, including young children, and I was very concerned for everyone that was

there." Whether or not her concern for the children is legitimate is irrelevant to the determination of whether she made the statements, and whether said statements implicate matters of public concern. Toxic conditions in a public school facility are very much a matter of public concern, and plaintiff's statements regarding the Haverstraw site are protected.

That the Haverstraw site was closed two months after plaintiff made her statements about toxicity meeting does not alter this conclusion. If there were actually harmful materials at the site, to which children may have been exposed, parents would want to know about it, regardless of whether the site was still operational. It was not "too late", as defendants say, for members of the public to benefit from plaintiff's speech on the issue. (Def. Reply Mem., 2.) Nor does the closure mean defendants would not have retaliated against plaintiff for complaining about it.

With respect to Dean Kodgis, plaintiff testified that she told them "that I was discriminated against and . . . harassed by the dean very badly [in 2000] . . . and I was shocked that he would get promoted." (B.Baum Tr. 77:1–24.) In her declaration, plaintiff further says that she expressed her concern that "the increase in responsibilities the Dean had received, notwithstanding the College's admission of discriminatory treatment of me, would allow the Dean to discriminate against even more individuals associated with the College." (B.Baum Opp. Decl. ¶ 32.) I recognize that taxpayers might be interested in knowing that the Director of Employee Rights had determined that Dean Kodgis was "derelict in his duties and responsibilities as Dean of Continuing Education" and recommended that he be disciplined, but that the County had chosen to promote him nonetheless. (*Id.* at pp. 27, 41.) Nonetheless, the overall tenor of plaintiff's statements appear to be focused on the

Dean's treatment of *her* in 2000 (claims which were subject to the Settlement Agreement) and therefore do not constitute a matter of public concern. Likewise any statements she may have made that she was discriminated against on the basis of her religion are not matters of public concern.

*There is no Causal Connection Between Plaintiff's Speech and the Alleged Adverse Action*

■ However, even assuming that the § 72 Exam constitutes an adverse employment action, plaintiff has offered no evidence tending to show that she was required to undergo a § 72 Exam in retaliation for her speech. "[A] plaintiff's speculations, generalities and gut feelings, however genuine, when . . . [un]supported by specific facts, do not allow for an inference of discrimination to be drawn . . . [A] plaintiff cannot defeat a motion for summary judgment by offering purely conclusory allegations of discrimination." *Little v. New York*, No. 96 Civ. 5132, 1998 WL 306545 at *6 (E.D.N.Y. June 8, 1998).

There is absolutely no evidence linking the College's decision to send plaintiff to the exam to plaintiff's statements about toxic conditions at Haverstraw (or to any of her other speech). Rather, the undisputed evidence amply demonstrates that the College's decision—made before any of her statements were made—stemmed from long standing concern with plaintiff's performance, and the recommendations of the County Human Rights Office. The evidence shows that several of plaintiff's supervisors had expressed concerns regarding plaintiff's ability to perform the relatively simple tasks assigned to her as early as 2001. (*See, e.g.,* Def. Ex. 22 (detailing concerns in 2001); Vazquez Tr.: 35:8–39, 163:8–167:15, 201:6–203:16 (describing concern for Baum and supervisor's complaints); Korenbaum Opp. Decl.,

472

Ex. O, 3.) The fact that some people said Baum's work was "fine," that she saved the College from having a typo in the graduation program, or even that the Director of Human Resources disagreed with the assessment that Baum was a danger to herself (Thayer Tr.: 86:11–88:5), does not mean that the College did not have reason to exercise its discretionary authority to send plaintiff to a § 72 Exam. Vazquez herself testified, "If [Baum] was going to stay, I felt it was in her best interest that she do a § 72 to get an assessment of what was going on with her." (Vazquez Tr., at 203.)

The College first decided to have plaintiff examined at least as early as May 2002—before she made any of the statements that are arguably of public concern. Furthermore, plaintiff was aware of the College's intention long before the July 22 meeting. (B. Baum Tr.: 56:6–58:9, 75:10–19). Therefore, plaintiff's claim that statements she made in June and July prompted the defendants' decision to send her to the exam in October is simply not tenable.

Defendant's motion for summary judgment on plaintiff's First Amendment Retaliation Claim is granted.

**Plaintiff's ADA and ADEA Retaliation Claim is Dismissed**

■ To establish a prima facie case of retaliation under the ADA or ADEA, plaintiff must establish that 1) the employee engaged in an activity protected by the ADA, 2) the employer was aware of the activity; 3) an employment action adverse to the plaintiff occurred, and 4) there existed a causal connection between the protected activity and the adverse action. *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155 (2d Cir.1999). The *McDonnell Douglas* burden-shifting analysis used in claims of discrimination in violation of Title VII also applies to claims of retaliation in violation of the ADEA and ADA. *See Terry v. Ashcroft,* 336 F.3d 128,

141 (2d Cir.2003) (citing, *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000)); *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002).

■ Defendants argue that Baum has failed to establish a *prima facie* case because she has neither suffered an adverse employment action nor shown that there was any causal link between plaintiff's filing the EEOC charge and her claimed adversities. Plaintiff argues that defendants' motion must be denied because it does not view the evidence in the light most favorable to the plaintiff. Specifically, plaintiff argues that a jury could find that from the time Baum filed her charge in May 2001 (the protected activity), to the execution of the Settlement Agreement, and to the time the exam was ordered, defendants knew that plaintiff's mental health was fine and her work performance was satisfactory. Plaintiff further argues that the jury could find defendants "conjured up" the idea of sending her to the exam after she filed her charge of discrimination, and that they did so to "even the playing field." (Pl.Opp.Mem., 14–15).

However, plaintiff's own opinion about the quality of her work does not make her employer's disagreement with the assessment retaliatory, and the evidence in this case shows the College had reasonable concerns. *See Valentine v. Standard & Poor's,* 50 F.Supp.2d 262 (S.D.N.Y.1999) (mere subjective disagreement with employer's performance reviews is not a viable basis for a discrimination claim). The New York State legislature has vested Civil Service employers with the discretion to direct an employee to a medical examination when the appointing authority believes that the employee is unable, due to a mental or physical disability, to perform the essential functions of her job. N.Y. Civ. Service Law § 72; *see also Jannsen v. Condo,* 101 F.3d 14 (2d Cir.1996)(deci-

sion to send plaintiff to a § 72 exam was discretionary and plaintiff cannot maintain a due process action against the government for failing to grant a hearing before dismissal). Plaintiff has not offered sufficient evidence from which a jury could determine that the College abused its discretionary authority in sending plaintiff to the exam.

In her most coherent argument on this issue, plaintiff contends that defendants had no rational basis on which to recommend her for a § 72 Exam, and that they manipulated the law in order to force her to attend the exam in retaliation for her speech. Plaintiff contends that this is a violation of the anti-discrimination laws, her right to privacy as well as a violation of substantive due process, which ipso facto is adverse employment action. (Pl. Opp.Mem.19–20.)

Plaintiff relies on *Kreuter v. Reuter*, No. 01 Civ. 5229, 2002 WL 31946715 at *11 (E.D.N.Y. Dec. 5, 2002) and *Figueroa v. City of New York*, 198 F.Supp.2d 555, 569 (S.D.N.Y.2002) to support her argument that being sent to a § 72 exam can constitute adverse employment action. In both cases, the courts considered the claims of individuals who claimed to have been subjected to repeated testing for alcohol and drug abuse. Both Judge Garaufis and Judge Scheindlin acknowledged that, if plaintiffs offered evidence that the drug testing policy was manipulated in some way such that they were disproportionally chosen for testing, such evidence could have established an adverse employment action. But Baum's assertion that the College manipulated the Civil Service Law to force her to take an unjustified exam is unsupported by any evidence, even when

drawing all reasonable inferences in her favor.

In trying to demonstrate the lack of basis for the § 72 exam, plaintiff says she, "demonstrated to Vazquez that the allegations leveled against her were baseless." (Pl.Mem.Opp., 14.) She believes she demonstrated this because Vazquez's allegedly told Marvin Baum his mother had one of the best-documented cases of discrimination she had seen. (Pl. Orig. Rule 56.1 Statement, ¶ 121.) But, Vazquez concluded plaintiff had been discriminated against because no one had recommended a § 72 exam before pressuring plaintiff to retire. (Def.Ex. 3, 1.) Vazquez made no finding about whether plaintiff suffered from dementia. Indeed she later recommended plaintiff be sent for the exam if she continued to work at the College. This is not evidence of disability or age discrimination.

Plaintiff also focuses on the fact that neither Gerhety or Latkovich, whose memoranda provided the support for the College's § 72 exam recommendation, were written seven or eight months before the exam was given. This to her mind means they were not competent to recommend that she be examined when she was examined.

However, while the memoranda may have been dated, it was within the College's discretion to send plaintiff to a § 72 exam. And there is at least some evidence that Latkovich's memo was updated. Latkovich testified that she updated her memo at some point, and one copy of the memo has a handwritten note saying it was updated over time and received on June 7, 2002. (Def.Ex. 22.) In light of conflicting evaluations of plaintiff's work,[8]

---

**8.** For example, Latkovic, characterized Baum's work performance as "ineffective," saying Baum "gets confused if you give her three pieces of paper. After giving her directions with them, she then will ask mo-

ments later, what she is to do with them." (Korenbaum Opp. Decl., Ex. O, 3.) Whereas another member of the graphics department said Baum's work was "fine."

the fact that at least some people had expressed concern about her capability of performing the duties of a clerk-typist, and Vazquez's recommendation that plaintiff undergo a § 72 exam if she remained with the College, I conclude that the College had a sufficient basis for requesting the exam and there is insufficient evidence suggesting the College manipulated the law to send plaintiff to the exam.

In evaluating whether someone has experienced an adverse employment action, courts are to consider whether, using an objective standard, the plaintiff can show "that the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir.2002). Applying this standard, I cannot conclude, nor could a reasonable jury, that the defendants' decision to send plaintiff to a single § 72 Exam constituted an adverse employment action.

Plaintiff admits that Dr. Kole conducted the exam in a professional manner. Indeed, a week after the exam, plaintiff voluntarily became a regular patient of his. (Kole Tr. 58–59, 67–72; Baum Tr. 35:5–17.) I understand that Mrs. Baum found the process humiliating, but she suffered no negative ramifications from undergoing the process, and the College was within its rights to send her. Had she been required to undergo several exams (as was the case in *Kreuter* ), lost time, pay or benefits the result might be different. But, in the context of this case, the decision to send plaintiff to a § 72 examination does not constitute an adverse employment action.

In an earlier opinion I noted that the failure to pay plaintiff her settlement could constitute an adverse employment action. But the factual record has now been fully developed, and it shows without contradiction that the reason defendants did not pay plaintiff the settlement monies was because she did not sign a release, not because of her age or disability. There is no evidence suggesting defendants' non-payment was motivated by plaintiff's filing the charge, nor does plaintiff argue as much.

Plaintiff's Third Claim for Relief is Dismissed.

## Plaintiff's Equal Protection Claim is Dismissed

The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people equally alike. *Harlen Assoc. v. Inc. Village of Mineola*, 273 F.3d 494 (2d Cir. 2001). In order to survive a motion for summary judgment, plaintiff must present evidence both of differential treatment from others similarly situated to her, and that the treatment was intentional, irrational, and wholly arbitrary. *Jackson v. Burke*, 256 F.3d 93, 97 (2d Cir.2001). Plaintiff has failed on both counts.

Plaintiff does not identify any specific individuals as being similarly situated to her. Instead, she points to the fact that no other employees were subject to a § 72 exam between October 2000 and February 2004. The simple fact that no one else was subjected to the claim does not mean that the other employees were similarly situated. She does not allege that complaints were directed at any other employees, let alone the same type of complaints that led people to wonder if she might be suffering from dementia. Rather, she argues that she was ordered to the exam "without any justification," which constituted different treatment.

Plaintiff's argument that she was sent to the exam without justification is contradicted by extensive evidence of her supervisors' and Vazquez's concerns with her performance. As such, it cannot be said that the College's decision was without

justification, irrational or wholly arbitrary, particularly in light of the discretion granted to it by the Civil Service Law.

Defendants' motion for summary judgment on plaintiff's equal protection claim is granted. Plaintiff's Fifth Cause of Action is dismissed.

### Qualified Immunity

Because plaintiff's § 1983 claims have been dismissed, I have no need to determine whether or not Dr. Voss is entitled to qualified immunity.

### Plaintiff's Motion to Amend the Complaint

 Plaintiff's motion to amend her complaint is denied except insofar as she seeks to substitute Rockland County in place of the College as a party-defendant. Where an arm of the County is sued, the County is the real party in interest.

Plaintiff's motion to amend the complaint to add a due process claim against defendants is denied. First, the parties' consent scheduling order required all amendments by January 13, 2004. Plaintiff made her motion on April 18, 2004. It is, therefore, untimely. *See Parker v. Columbia Pictures Industries*, 204 F.3d 326 (2d Cir.2000).

Second, the amendment would be futile. *Marchi v. Board of Coop. Educ. Services of Albany*, 173 F.3d 469, 478 (2d Cir.1999). As discussed above, the College has discretion to require an employee to submit to a § 72 exam. Plaintiff has no liberty interest in not having the County require her to take an exam. *Poe v. Leonard*, 282 F.3d 123 (2d Cir.2002) ("touchstone of due process is protection of the individual against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective.")

### CONCLUSION

Plaintiff's Motion for Summary Judgment on her First and Second Causes of Action is granted. Plaintiff's Third, Fifth and Sixth Causes of Action are dismissed.

Judgment in favor of the plaintiff for $62,500 will be entered against Rockland County and not the College. Therefore, the Clerk is directed to substitute "Rockland County" for "Rockland Community College" in the caption.

This constitutes the decision and order of the Court.